Francis PENTERMAN, Sr. and Ruth Kamnik, Plaintiffs-Appellants-Petitioners,

DUPONT MUTUAL INSURANCE COMPANY, a Wisconsin Insurance Corporation, Involuntary-Plaintiff,

v.

WISCONSIN ELECTRIC POWER COMPANY, a domestic corporation, Defendant,

Daniel M. DASHO, Defendant-Respondent.

Supreme Court

*No. 96–0164. Oral argument May 29, 1997.—Decided July 2, 1997.*

(Also reported in 565 N.W.2d 521.)

459

For the plaintiffs-appellants-petitioners there were briefs by *Lynn R. Laufenberg* and *Cannon & Dunphy, S.C.*, Brookfield and *Scott Lawrence* and *Lawrence & Des Rochers, S.C.*, St. Nazianz and oral argument by *Lynn R. Laufenberg*.

For the defendant-respondent the cause was argued by *Charles D. Hoornstra*, assistant attorney general, with whom on the brief *Richard A. Victor*, assistant attorney general, and *James E. Doyle*, attorney general.

¶ 1. JANINE P. GESKE, J. This is a review of an unpublished decision of the court of appeals[1] affirming the order of the Circuit Court for Outagamie County, John A. Des Jardins, Judge. The circuit court dismissed the claims of Francis Penterman, Sr. and Ruth Kamnik against Daniel Dasho, an employee of the Wisconsin Public Service Commission, for failure to state a claim upon which relief could be granted. The circuit court also concluded that Dasho was entitled to qualified immunity against the plaintiffs' claims. Penterman and Kamnik alleged in their amended complaint that Dasho deprived them of their constitutionally protected rights, and sought remedies under 42 U.S.C. § 1983.[2]

¶ 2. The court of appeals affirmed the circuit court in part, holding that Penterman and Kamnik failed to state a claim upon which relief could be granted. In a footnote to its decision, the court of appeals concluded that it was unnecessary to address

---

[1] *Penterman v. Wis. Electric Power Co.*, No. 96–0164, unpublished slip op. (Wis. Ct. App. Aug. 6, 1996).

[2] 42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

the issue of qualified immunity for Dasho because the amended complaint failed to state a claim. Slip op. at 2, n.2.

¶ 3. This case presents unique legal claims. Because damage to livestock and loss of use of farm property are not commonly claimed to result from constitutional violations, and because the affirmative defense of qualified immunity turns on whether the plaintiffs have alleged a violation of clearly established constitutional rights, we consider the questions presented in reverse order from the court of appeals. Since we conclude that Penterman and Kamnik have not made a sufficient showing that Dasho violated a clearly established constitutional right, defined in such a way that a reasonable official in Dasho's position could believe that his or her conduct violates that right, we do not consider whether the plaintiffs have stated a claim against Dasho upon which relief can be granted. We therefore affirm the mandate of the court of appeals, but on the ground of qualified immunity.[3] In this case we make no new law but apply a traditional qualified immunity inquiry to unusual pleadings. We caution, therefore, that our qualified immunity inquiry is fact-specific, limited to the facts alleged in the pleadings.

### FACTS AND PROCEDURAL HISTORY

¶ 4. For purposes of the qualified immunity analysis on review of a motion to dismiss, we accept the facts pled as true. *See State v. Wisconsin Telephone*, 91 Wis. 2d 702, 720, 284 N.W.2d 41 (1979). Penterman

---

[3] Our decision that Dasho is entitled to qualified immunity has no bearing on the merits of the plaintiffs' underlying claims against the defendant utility.

and Kamnik acquired a farm in Waushara County in April, 1992. They operated the property as a dairy farm. A distribution line, owned and operated by Defendant Wisconsin Electric Power Company (WEPCo), provided electrical service to the farm.

¶ 5. It appears from the complaint that for some time between April 1992 and January 12, 1993, Penterman and Kamnik experienced substantial problems with their dairy operation, including reduced milk production, increased illness and death of cattle, calves, and other livestock, and infertility. On January 12, 1993, Penterman received an electrical shock from the bulk tank in the milk house located on the farm. Penterman believed the shock originated from stray electrical voltage accessing his barn through WEPCo's distribution line. On January 31, 1993, Penterman disconnected the barn service cable from the WEPCo distribution line and connected a portable generator to supply power to the barn equipment. Once he took that action, Penterman did not detect any voltage between equipment and fixtures and the concrete floor.

¶ 6. The next day, February 1, 1993, Penterman contacted the Wisconsin Public Service Commission's (PSC) Stray Voltage Analysis Team (SVAT) about the problems on the farm. Penterman was told that SVAT would contact WEPCo on his behalf to advise WEPCo of a possible stray voltage problem. WEPCo representatives conducted tests at the Penterman/Kamnik farm, concluding that the stray voltage was the result of "on farm problems."

¶ 7. On February 8, 1993, WEPCo performed further tests at the Penterman/Kamnik farm. Penterman and Kamnik claimed that WEPCo's testing procedures contained irregularities and reported these claims to Daniel Dasho, Program Manager of SVAT. On Febru-

ary 12, 1993, Dasho and WEPCo representatives came to the Penterman/Kamnik farm. During that visit, Dasho supervised the reinstallation of WEPCo's test equipment and observed voltage readings on Penterman's test equipment.

¶ 8. On February 24, 1993, Dasho and WEPCo representatives again went to the Penterman/Kamnik farm. Dasho observed additional tests conducted by WEPCo, and then told WEPCo's representatives that the stray voltage was a utility problem. Dasho instructed WEPCo to "deep ground" its distribution line. WEPCo placed grounding rods, but Penterman and Kamnik contend that the excess voltage continued.

¶ 9. After the February 24, 1993 testing, Penterman and Kamnik continued to ask WEPCo and the PSC for additional testing and further assistance. Dasho informed Penterman and Kamnik that the utility responsibility had been fixed, and that any remaining voltage was from "on-farm" sources. Dasho also told Penterman and Kamnik that a full SVAT analysis was unnecessary.

¶ 10. On March 24, 1994, almost fourteen months after Penterman first discovered the stray voltage on his farm, Dasho directed and supervised a limited SVAT analysis for stray voltage at the Penterman/Kamnik farm at Penterman's request. Dasho reported afterwards that SVAT had found no severe levels of stray voltage. Penterman and Kamnik contend that there were irregularities in these SVAT tests and inconsistencies between Dasho's report and the data actually discovered during the course of the testing.

¶ 11. Penterman and Kamnik filed suit against WEPCo on January 25, 1995, alleging strict liability, nuisance, negligence, trespass, spoilation of evidence,

and statutory violations. After conducting some discovery, Penterman and Kamnik filed an amended complaint on June 13, 1995, adding Dasho as a defendant and asserting claims against Dasho and WEPCo for damages under 42 U.S.C. § 1983. Penterman and Kamnik alleged that Dasho, acting under color of state law, deliberately, intentionally,[4] and/or recklessly deprived them of their constitutionally protected rights to procedural due process, access to the courts, substantive due process, and equal protection. Specifically, Penterman and Kamnik alleged that Dasho, in concert with WEPCo,

> (a) failed to follow or employ PSC procedures for the identification and measurement of stray voltage;
> (b) approved or ratified testing procedures and practices employed by WEPCo which he knew or should have known were ineffective for identifying or eliminating utility-caused stray voltage;
> (c) attributed stray voltage detected and documents by Penterman and Kamnik to faulty equipment or testing procedures when he knew or should have known that such attribution was false;
> (d) reported information obtained through testing he knew or should have known was improperly conducted and would produce inaccurate results;

---

[4] The factual allegations of the amended complaint also appear to state a cause of action in negligence. *See, e.g.*, subsections (b) through (g), of paragraph 22 of the amended complaint. To the extent the complaint alleges that Dasho was negligent, we agree with the court of appeals that the due process clause is not implicated by the negligence of an official causing unintended loss of, or injury to, life, liberty, or property. Slip op. at 7 (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).

(e) attributed stray voltage to on-farm wiring problems or electrical usage patterns when he knew or should have known that such attribution was false;

(f) refused to recommend or require WEPCo to implement corrective action which he knew or should have known was required to reduce or eliminate harmful utility-caused stray voltage on the farm;

(g) characterized stray voltage on the Penterman/Kamnik farm as "not severe" or "insignificant" when he knew or should have known that such characterization was inaccurate; and

(h) conspired with and/or aided and abetted WEPCo in its effort to conceal evidence of utility-caused stray voltage on the farm.

¶ 12.   On August 3, 1995, Dasho filed a motion to dismiss the amended complaint on the ground that it failed to state a claim upon which relief could be granted. In his brief in support of that motion, Dasho also argued that he was entitled to qualified immunity from the claims. After a hearing, the circuit court granted Dasho's motion to dismiss in an order dated November 27, 1995. The circuit court, basing its decision on the pleadings and the briefs, concluded that Penterman and Kamnik had failed to state a claim upon which relief could be granted against Dasho for interference with their right to procedural and substantive due process, access to courts, and to equal protection. The circuit court also concluded that Dasho was entitled to qualified immunity from Penterman and Kamnik's constitutional claims.

¶ 13.   Penterman and Kamnik appealed. The court of appeals affirmed the circuit court's order, concluding that the amended complaint against Dasho failed to state a claim upon which relief could be

granted. The court of appeals further concluded that because Penterman and Kamnik failed to state a claim, it was unnecessary to determine whether Dasho was entitled to qualified immunity. This court granted Penterman and Kamnik's petition for review on both issues.[5]

## QUALIFIED IMMUNITY

▓▓

¶ 14. We begin our analysis by examining whether the circuit court correctly dismissed defendant Daniel Dasho from this action on the ground of qualified immunity. This is a question of law that we decide independently and without deference to the lower courts. *Kara B. v. Dane County*, 205 Wis. 2d 140, 555 N.W.2d 630, 632 (1996); *Barnhill v. Board of Regents*, 166 Wis. 2d 395, 406, 479 N.W.2d 917 (1992). If the public official is immune from suit, the lawsuit does not proceed and there is no determination of liability on the merits. Qualified immunity is appropriately resolved at the summary judgment stage[6] before

---

[5] This court granted Penterman and Kamnik's petition for review on the questions of substantive due process, equal protection, and qualified immunity. Although the petition for review did not seek review of the court of appeals' ruling on procedural due process deprivation and access to the courts, those claims were presented in the briefs and oral arguments by counsel for Penterman and Kamnik as well as for Dasho. The state acknowledged at oral argument that it has not been prejudiced by consideration of these issues. We therefore exercise our discretion to consider all of the issues raised by the petitioners.

[6] We note that this case is before us on a motion to dismiss. Although the plaintiffs engaged in some discovery prior to amending the complaint and adding Dasho as a defendant, we

extensive measures are taken to defend the public official or employee. *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

¶ 15. Although "[q]ualified immunity is an affirmative defense," *Burkes v. Klauser*, 185 Wis. 2d 308, 327, 517 N.W.2d 503 (1994), *cert. denied*, 115 S. Ct. 1102 (1995), plaintiffs have the burden to demonstrate by closely analogous case law, that the defendant has violated a clearly established constitutional right. *Id.* at 330.

¶ 16. Qualified immunity protects government officials from civil liability if their conduct does not violate a person's clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Kara B.*, 205 Wis. 2d at 146; *Burkes*, 185 Wis. 2d at 326.

> In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.. . .
>
> [A]t the same time, however, it cannot be disputed seriously that claims [against public officials] frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deter-

must decide a motion to dismiss for failure to state a claim based only on the pleadings. Although usually, the defense of qualified immunity is raised at the summary judgment stage, Penterman and Kamnik do not assert that it is premature for a qualified immunity determination simply because they are here on a motion to dismiss.

rence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'

*Harlow*, 457 U.S. at 814 (citations omitted); *see also Burkes*, 185 Wis. 2d at 325–26; *Kara B.*, 205 Wis. 2d at 146.

¶ 17.   The question is whether the official acted reasonably under settled law in light of the circumstances, not whether another reasonable, or more reasonable, interpretation of events can be constructed after the fact. *Barnhill*, 166 Wis. 2d at 408. The relevant inquiry, then, is whether a reasonable state official could have believed his or her act was constitutional "in light of clearly established law and the information [he or she] possessed" at the time of the official's action. *Burkes*, 185 Wis. 2d at 326 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "The plaintiff's claimed right must be sufficiently particularized to put the defendants on notice of analogous case law indicating that their conduct is unlawful." *Burkes*, 185 Wis. 2d at 331. The doctrine of qualified immunity provides ample room for mistaken judgments by protecting all but the "plainly incompetent" or those who knowingly violate the law. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

¶ 18.   The United States Supreme Court has provided some guidance in determining what constitutes a clearly established constitutional right:

> The operation of this standard. . .depends substantially on the level of generality at which the relevant "legal rule" is to be identified. For example, the

right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.. . .The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Barnhill, 166 Wis. 2d at 407–08 (quoting *Anderson v. Creighton*, 483 U.S. at 640) (citations omitted). Other courts have articulated a similar test:

The relevant inquiry is fact specific, and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on materially similar facts. . . . [P]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violated federal law in the circumstances.

*Wright v. Butts*, 953 F. Supp. 1352, 1359–60 (M.D. Ala. 1996) (citations omitted).

■

¶ 19.    Merely alleging a general violation of a right that may be clearly established in the constitution is insufficient to justify withholding qualified immunity. *Barnhill*, 166 Wis. 2d at 408. Instead, the test is whether the law was clear in relation to the specific facts confronting the defendant at the time of his action. *Burkes*, 185 Wis. 2d at 330–331. This

inquiry focuses on the circumstances with which the official is confronted.

¶ 20. Consequently, we must determine whether in February, 1993 through March, 1994, according to clearly established law, a reasonable official in Dasho's position could have believed that his falsification and concealment of evidence of stray voltage at the Penterman/Kamnik farm would violate the plaintiffs' constitutional rights to procedural due process, access to the courts, substantive due process, and equal protection.

## SECTION 1983 CLAIM

¶ 21. Penterman and Kamnik's amended complaint added Dasho as a defendant and seeks damages pursuant to 42 U.S.C. § 1983 against both Dasho and WEPCo.

¶ 22. Section 1983, by itself, does not create any substantive constitutional rights. Section 1983 provides a remedy for a deprivation of such rights. *Chapman v. Houston* Welfare Rights Organization, 441 U.S. 600, 617–18 (1979). To state a cause of action under § 1983, a party must allege: (1) that a person acting under the color of state law committed the alleged conduct; and (2) that this conduct deprived the party of rights, privileges, or immunities protected by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

¶ 23. In applying this test, we first consider whether Dasho was acting under the color of state law when he falsified and concealed evidence of the extent of stray voltage on the Penterman/Kamnik farm. Because the amended complaint alleges that Dasho

was the Program Manager for the Wisconsin Public Service Commission's (PSC) Stray Voltage Analysis Team (SVAT), we conclude that Penterman and Kamnik have satisfied the "under the color of state law" requirement. We therefore focus our inquiry on the second requirement—whether Dasho's conduct deprived Penterman and Kamnik of any right, privilege, or immunity secured by the Constitution or laws of the United States.

## PROCEDURAL DUE PROCESS AND ACCESS TO COURTS

¶ 24.   In support of their procedural due process claim, Penterman and Kamnik maintain that Dasho's falsification and concealment of evidence has thwarted their efforts to seek recovery of compensatory damages in their suit against WEPCo. Similarly, plaintiffs contend that Dasho's falsification and concealment of evidence of the cause of the stray voltage has violated their right of access to the courts. Petitioners' Brief at 39. Since both constitutional claims present us with the same question of whether Dasho should have reasonably believed that falsification and concealment of stray voltage testing results was a denial of a clearly established constitutional right to maintain their action against WEPCo, we consider these claims together. .

¶ 25.   In a section 1983 claim for violation of procedural due process, a plaintiff must show a deprivation by state action of a constitutionally protected interest in "life, liberty, or property" without due process of law. *Zinermon*, 494 U.S. at 125 (citing the Due Process Clause of the Fourteenth Amendment).[7]

---

[7] U.S. CONST. Amend. XIV, § 1

The right of access to the courts is secured by the First[8] and Fourteenth Amendment. It entitles the individual to a fair opportunity to present his or her claim. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (1984) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Such a right exists where the claim has a "reasonable basis in fact or law." *Bell*, 746 F. 2d at 1261 (citing *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731 (1983)). Judicial access must be "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977).

¶ 26.   To determine whether Dasho is entitled to the protections of qualified immunity, the relevant inquiry is whether a person in Dasho's position could have reasonably believed his or her act was constitutional in light of *clearly established law* and the information he possessed at the time he acted. *Burkes*, 185 Wis. 2d at 326 (emphasis added). Dasho's conduct thus is measured by a standard of objective legal reasonableness, and in this context we focus on the degree to which *clearly established case law* provided him guidance when he acted. *Barnhill*, 166 Wis. 2d at 407–08 (emphasis added). Consequently, we must determine whether in March 1994, Dasho knew or should have known that his actions would deny Penterman and

**Section 1.**   All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[8] U.S. CONST. Amend. I provides in pertinent part:

Congress shall make no law. . .abridging. . .the right of the people . . .to petition the Government for a redress of grievances.

Kamnik their right to procedural due process and access to the courts.

¶ 27.   Penterman and Kamnik rely on *Bell* to establish their claim that Dasho's actions denied them access to the courts and, inferentially, procedural due process. In *Bell*, the Seventh Circuit Court of Appeals held that under limited circumstances, this right is denied when key facts which would form the basis for a plaintiff's claim are shielded from a plaintiff. 746 F.2d at 1261. *See also Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) (prosecutor murdered Rylands' daughter and conspired with other prosecutors to conceal that fact from the Rylands). Penterman and Kamnik argue that Dasho shielded facts which would form the basis of their claim by knowingly reporting that no severe stray voltage existed, when in fact it did exist at such a level on their farm. We disagree and distinguish *Bell* from the facts of this case on several grounds.

¶ 28.   In *Bell*, a Milwaukee police officer shot and killed an unarmed youth following a foot chase. 746 F.2d at 1215. The officer then produced a knife and planted it in the victim's hand. Along with his partner, the officers devised a story to justify the killing as self-defense. *Id.* at 1216. Both officers then falsified reports related to the shooting and lied to their immediate supervisors. The supervisors did not pursue contradictions present in the officers' accounts of the shooting. The facts surrounding the killing were in the sole province of members of the Milwaukee police department. *Id.* at 1262. While the youth's father filed a wrongful death claim soon after his son's murder, the officers' cover-up and concealment of facts interfered with the Bell family's efforts to seek redress in court. *Id.* at 1261–62.

¶ 29. In contrast, the facts relating to Penterman and Kamnik's claim were available to any interested party, including the plaintiffs. Indeed, the allegations in the amended complaint suggest that the plaintiffs accumulated a substantial body of knowledge relating to their claim prior to the commencement of this action. In their complaint, Penterman and Kamnik allege that Dasho's falsification and concealment of evidence of the extent of the stray voltage testing resulted in continued stray voltage on the farm, which caused, among other things, (1) death of livestock, (2) reduction in value of affected livestock, (3) reduction in milk production, and (4) reduction in the value of property. At oral argument, however, Penterman and Kamnik acknowledged that Dasho played no role in causing the stray voltage on the farm. Further, after detecting stray voltage, Penterman temporarily eliminated the problem by disconnecting the barn service cable from the WEPCo distribution line and connecting a portable generator to supply power to the barn equipment. Petitioner's Brief at 4.

¶ 30. Penterman and Kamnik were experiencing problems on their new farm before Penterman received an electrical shock on January 12, 1993. It was at that point, according to the amended complaint, that Penterman first discovered there may be stray voltage on the farm. Further, over the course of Dasho's visits to the Penterman/Kamnik farm in 1993 and 1994, Dasho only told the plaintiffs that the stray voltage on their property was insignificant, or not severe. Amended Complaint, para. 22(h). The amended complaint does not allege that Dasho told the plaintiffs that no stray voltage was present on their farm.

¶ 31. Unlike the plaintiff in *Bell*, the amended complaint here does not allege that facts related to

Penterman and Kamnik's claim were shielded from them. Instead, the allegations establish that Penterman and Kamnik, through their own efforts and through the involvement of the PSC, possessed first-hand knowledge of the facts related to the existence, and extent, of stray voltage on their farm. Armed with this knowledge, Penterman and Kamnik are free to pursue their underlying claims. The stray voltage was already present on the plaintiffs' farm prior to Dasho's involvement. Penterman and Kamnik, by installing an alternate energy source, had the means to eliminate or reduce further damage resulting from the stray voltage.

¶ 32.   The court of appeals succinctly distinguished both *Bell* and *Ryland* from this case. In those cases, the facts surrounding the deaths were in the sole control of the defendants. Slip op. at 6. In contrast, here the evidence Dasho concealed was not in his sole control. We therefore agree with the court of appeals that Dasho's actions, at worst, hampered Penterman and Kamnik's discovery of evidence. Such factual assertions fall short of alleging a violation of a clearly established right of access to the courts, or of procedural due process, such that a reasonable official in Dasho's position would believe his or her conduct violated those rights.[9]

¶ 33.   We further distinguish *Bell* from the facts of this case because Dasho did not cause Penterman

---

[9] In fact, the amended complaint tends to support the conclusion that Penterman and Kamnik have suffered no impediment to their right of access to the courts, or to procedural due process. Paragraph 17 of the amended complaint seeks "attorneys fees and costs associated with pursuing rights and remedies afforded by state and federal law."

and Kamnik's injury. The *Bell* court recognized this distinction:

> This case is especially distinguishable from *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir. 1983), since here, unlike Jackson, the underlying injury (*i.e.*, the killing of Daniel Bell) was caused by a government official acting under color of law and member of the subsequent conspiracy. Jackson prudently holds that the due process clause does not impose a duty upon municipal employees to provide flawless and abundant social services. Yet, the constitutional "duty" imposed in [Bell] is simply the requirement that municipal employees involved in the investigation of a wrong perpetrated by a co-employee under color of state law not conceal the perpetration of that wrong.

*Bell*, 746 F.2d at 1262.

¶ 34. *Bell* would apply if Dasho, acting under color of law, caused the injury to Penterman and Kamnik, and subsequently concealed the act which caused the injury during the course of his investigation. Penterman and Kamnik allege, however, that WEPCo, not Dasho, was responsible for the stray voltage which injured their farm property. *Bell*, therefore, is not applicable.

¶ 35. Finally, we are not persuaded by Penterman and Kamnik's argument that their access to the courts, and inferentially, their right to procedural due process against WEPCo is illusory. In their brief, the plaintiffs predict that Dasho will be called upon to testify at the trial against WEPCo. They further forecast that a jury in that action will find Dasho more credible than the plaintiffs because Dasho is a public official. Petitioners' Brief at 38–39.

¶ 36.   Penterman and Kamnik do not offer support for this theory of deprivation, and we are unaware of any authority that would do so. The law regarding witness credibility, however, is well settled. The Wisconsin Jury Instructions specifically provide that juries are "the sole judges of credibility of witnesses and the weight to be given to their testimony." Wis JI—Civil § 215. (Approved in *Collier v. State*, 30 Wis. 2d 101, 107, 140 N.W.2d 252 (1966)). *See also, Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 681, 280 N.W.2d 226 (1979) (the credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment).

¶ 37.   As the Supreme Court stated in *Wolff v. McDonnell*, 418 U.S. 539 (1974), the right of access to courts "assures that no person will be denied the *opportunity to present to the judiciary allegations* concerning violations of fundamental constitutional rights". 418 U.S. at 579 (emphasis added). Penterman and Kamnik remain free to present their claim regardless of whether their discovery is hampered.

## SUBSTANTIVE DUE PROCESS

¶ 38.   Penterman and Kamnik also argue that Dasho's conduct on their farm resulted in a deprivation of their property in violation of their right to substantive due process. Specifically, Penterman and Kamnik maintain that Dasho deprived them of their rights to use and enjoyment of the farm property by, among other things, (1) failing to follow or employ proper procedures for identifying and measuring stray voltage, (2) attributing the detected stray voltage to on-farm wiring problems or faulty equipment when he knew or should have known such information was false, and (3) conspiring with WEPCo to conceal evidence of utility-

caused stray voltage on the farm. Petitioners' Brief at 10.

¶ 39.   The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." The Supreme Court has interpreted the constitutional guarantee of due process to protect both procedural and substantive rights. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The substantive component of the Due Process Clause protects individuals from "certain arbitrary, wrongful actions 'regardless of the fairness of the procedures used to implement them.' " *Id.* (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

¶ 40.   In evaluating a substantive due process claim, the threshold inquiry is whether the plaintiff shows a deprivation of a liberty or property interest protected by the Constitution. *See Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994) (citing *Regents v. Roth*, 408 U.S. 564, 569 (1972)). To determine whether a property interest is protected by the Fourteenth Amendment, courts must look to whether state law recognizes and protects that interest. *See Riedy v. Sperry*, 83 Wis. 2d 158, 164 (1978). "Property interests. . .are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . ." *Roth*, 408 U.S. at 577 (1972).

¶ 41.   As Dasho concedes, it is well settled that the rights of ownership and use of property have long been recognized by this state.[10] Respondent's Brief at

---

[10] The court of appeals misconstrued Penterman and Kamnik's argument when it stated that "mere property inter-

480

9. *See State ex rel. Carter v. Harper*, 182 Wis. 148, 152 (1923). It is equally clear, however, that the due process clause does not protect all deprivations of property rights, "but only those deprivations which were the result of some governmental action." *Cospito v. Heckler*, 742 F.2d 72, 81 (3rd Cir. 1984), *cert. denied*, 471 U.S. 1131 (1985).

¶ 42.   As we read the amended complaint, however, the plaintiffs do not really contend that Dasho has deprived them of their right to enjoy and use their property. Penterman and Kamnik have already conceded that Dasho did not cause the stray voltage. Despite their attempt to make out a claim of substantive due process violation, this third constitutional allegation is, at bottom, another claim for deprivation of information for use at trial against WEPCo.

¶ 43.   In an attempt to make a substantive due process claim, Penterman and Kamnik cite *Hearn v. City of Gainesville*, 688 F.2d 1328 (11th Cir. 1983) for the proposition that the deprivation of a person's property interest by a government official who intentionally reports false information is a violation of the person's substantive due process rights. Petitioners' Brief at 30.

¶ 44.   In Hearn, a city of Gainesville employee, sued the city and the city's personnel director after being laid off. Hearn claimed that the decision to eliminate his position was merely a pretext and that the personnel director's dislike for him was the actual

─────────────────────────

ests are not subject to substantive due process claims." Slip op. at 10. We agree with the appellate court that substantive due process protection has traditionally been afforded to liberty interests, such as marriage, family, procreation, and bodily integrity. Nonetheless, we do not take the court of appeals decision to mean that the right to enjoy and use personal property is not subject to constitutional protection.

481

impetus for his termination. *Id.* at 1332. Hearn alleged that the personnel director gave the city commissioner false information regarding the workload in Hearn's department to cause the city to eliminate his position. *Id.* at 1332. The court concluded that, under Florida law, Hearn had a property interest in his continued employment. The court also upheld the jury's determination that the personnel director's animosity toward Hearn was the sole cause of his termination. *Id.* at 1333.

¶ 45. Penterman and Kamnik contend that Hearn is analogous to the instant case. We disagree. In Hearn, the personnel director's intentional understating of the departmental workload was the direct and sole cause of the employee's property rights deprivation. Presumably, Hearn would not have lost his position absent the false information. *See id.* at 1332. In this case, the stray voltage was the direct source of Penterman and Kamnik's loss of use and enjoyment of their farm property. Dasho's conduct in supervising and reporting WEPCo's test results did not cause the stray voltage. As Penterman and Kamnik acknowledged at oral argument, at most, Dasho's conduct merely caused the continuation of the property loss. The Hearn decision is not, therefore, closely analogous to the facts before us.[11]

---

[11] Although Penterman and Kamnik cite a number of cases to establish a substantive due process violation, we read those cases as merely establishing that property rights, like those asserted here, can merit constitutional protection. We do not read those cases as establishing, by closely analogous case law, that Dasho's falsification and concealment of evidence of stray voltage constituted a deprivation of Penterman and Kamnik's right to substantive due process. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564 (1972); *DeBlasio v. Zoning Bd. of Adjustment*

¶ 46. Without providing closely analogous case support for his claim that the continued deprivation of a property interest by a state actor violates a person's substantive due process rights, Penterman has failed to show that Dasho knew or should have known that his falsification and concealment of evidence of stray voltage violated Penterman's substantive due process rights. We, therefore, conclude that Penterman and Kamnik have failed to overcome Dasho's qualified immunity defense as their substantive due process claim.

## EQUAL PROTECTION

¶ 47. Finally, we consider whether Penterman and Kamnik have made a sufficient showing of a clearly established right to equal protection, such that a reasonable official in Dasho's position would have known his conduct violated that right.

¶ 48. Under the Equal Protection Clause of the Fourteenth Amendment, a state may not deny "any person within its jurisdiction the equal protection of the laws." States, therefore, must treat all similarly situated persons alike. *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).

¶ 49. Traditionally, we have recognized two types of equal protection claims. The first involves intentional discrimination based on membership in a particular class or group. *See, e.g., State v. Chosa*, 108 Wis. 2d 392, 395–97, 321 N.W.2d 280 (1982). The sec-

*for Twp. of West Amwell*, 53 F.3d 592 (3d Cir. 1995); *Noranda Exploration, Inc. v. M.E. Ostrom*, 113 Wis. 2d 612, 335 N.W.2d 596 (1983).

ond involves challenges to legislation alleged to make irrational and arbitrary classifications. *See, e.g., State v. Post*, 197 Wis. 2d 279, 541 N.W.2d 115 (1995). In this case, Penterman and Kamnik do not contend that their equal protection claim falls within either of these generally recognized theories.

¶ 50. Penterman and Kamnik, however, argue that their claim falls within a third type of equal protection claim recognized by the Seventh Circuit in *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995). In *Esmail*, a liquor dealer, Esmail, brought a § 1983 claim against the city mayor, maintaining that the mayor violated his equal protection rights by refusing to renew Esmail's liquor licenses due to a "deep-seated animosity" toward him. *Id.* at 177–78. In his complaint, Esmail alleged that the mayor denied his two applications for liquor licenses "for the sole and exclusive purpose of exacting retaliation and vengeance" against Esmail due, in part, to Esmail's success in getting an earlier revocation order of his liquor license changed to a brief suspension. *Id.* at 178. Although the mayor maintained that Esmail's license had been denied because of previous violations, Esmail's complaint provided an extensive list of examples where the mayor had renewed other license applications by applicants who had been charged with more serious violations. *Id.* at 178.

¶ 51. In finding that Esmail had sufficiently stated a claim under § 1983, the Seventh Circuit rejected the district court's conclusion that Esmail's complaint failed to state a claim because it did not allege that other liquor dealers, who were not subject to vindictiveness or animosity, received their license renewals *at the same time* that Esmail's application had been denied. *Id.* at 179 (emphasis added). The

court found that a complaint containing such "extensive" factual allegations, despite failing to list the dates of the infractions by the other liquor dealers, was sufficient to indicate that the mayor treated Esmail differently than similarly situated persons. *See id.* at 179–80.

¶ 52.     Unlike Esmail, Penterman and Kamnik do not claim that they were treated differently than other persons who requested Dasho's assistance in dealing with stray voltage problems. In fact, Penterman and Kamnik allege that Dasho's conduct was part of a continuing conspiracy with WEPCo to deprive Wisconsin farmers, including Penterman and Kamnik, of evidence necessary to support recovery of compensatory damages in lawsuits against WEPCo. To establish that Dasho knew or should have known that by concealing and falsifying evidence of stray voltage on the Penterman/Kamnik farm, he violated a clearly established right of equal protection, Penterman and Kamnik must demonstrate that they were singled out as members of a particular class or as individuals. *See Albright v. Oliver,* 975 F.2d 343, 348 (7th Cir. 1992), *aff'd,* 510 U.S. 266 (1994) (to state an equal protection claim, a plaintiff, although a member of a class with only one member, must be singled out because of his membership in the class).

¶ 53.     Penterman and Kamnik do not allege that they were treated differently than other persons similarly situated. We therefore conclude that they have failed to make a sufficient showing of a violation of a clearly established right to equal protection, such that a reasonable official in Dasho's position would have known his conduct violated that right.

¶ 54. For all of the foregoing reasons, we conclude that Penterman and Kamnik have not met their burden to sufficiently show a violation of clearly established constitutional rights, such that a reasonable official in Dasho's position would know, or should have known, that his conduct violated those rights. Dasho is entitled to qualified immunity against these claims.

*By the Court.*—The decision of the court of appeals is affirmed.