Linda A. ANDE, Charles Ande, C.E.A., a minor, and C.L.A., a minor, Plaintiffs-Appellants,†

v.

Michael ROCK, Norman C. Fost, Philip M. Farrell, Elaine H. Mischler, Richard A. Aronson, and Anita Laxova, Defendants-Respondents,

UW HOSPITAL AND CLINICS, UW Medical School, Wisconsin Department of Health & Social Services, Medical College of Wisconsin-Milwaukee, Wisconsin State Laboratory of Hygiene, State of Wisconsin, Ronald Laessig, Karen Keil, M. Cotler, C. Kelly, S. Allard, Ellen Connor, David B. Allen, E. Connor, Tom Murwin, L. Reimann, Gordon Tuffli, Gurbax Sekhom, Michael R. Kosorok, Rebecca E. Koscik, Mark Splaingard, C. Green, M. Palta, A. Tluczek, M. Block, L. A. Davis, B. S. Wilfond, W. Gershan, L. Rusakow, G. Hoffman, D. J. Hassemer, John Doe, Jane Doe, XYZ Funding Agency, Connecticut General Life Insurance Company, ABC Insurance Company, and Unity Health Plans, Defendants.

Court of Appeals

*No. 01–1009. Submitted on briefs October 5, 2001.—Decided May 16, 2002.*

2002 WI App 136

† Petition to review denied 7-26-02.

(Also reported in 647 N.W.2d 265.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Paul A. Kinne* and *Michael J. Luebke* of *Gingras, Cates & Luebke, S.C.* of Madison.

On behalf of the defendant-respondent Richard A. Aronson, the cause was submitted on the brief of *Kristine A. Edwards* and *Marie A. Stanton* of *Hurley, Burish & Milliken, S.C.* of Madison.

On behalf of the defendants-respondents Michael Rock, Norman C. Fost, Philip M. Farrell, Elaine H. Mischler, and Anita Laxova, the cause was submitted on the brief of *James E. Doyle*, attorney general and *John J. Glinski*, assistant attorney general.

Before Dykman, Roggensack and Deininger, JJ.

¶ 1. ROGGENSACK, J. Linda A. Ande, Charles Ande and their minor children, C.E.A. and C.L.A. who

suffer from cystic fibrosis, brought suit against individual defendants, all of whom are state employees, and certain institutions alleging numerous state and federal claims related to the children's cystic fibrosis. The circuit court dismissed all of the state claims, except those for medical malpractice, after concluding that notice pursuant to WIS. STAT. § 893.82(3) (1995–96)[1] for those state claims had not been timely given. In regard to the medical malpractice claims, the circuit court dismissed them because there was no showing of a physician-patient relationship between the remaining physician-defendants and any plaintiff.[2] The circuit court also dismissed the federal claims, doing so on the basis of qualified immunity because the plaintiffs had not shown that any plaintiff had a clearly established right that any defendant's conduct violated. On appeal, the plaintiffs do not contest the circuit court's decision on the lack of timely notice under § 893.82(3). Plaintiffs bring before us for review only their claims for medical malpractice and their federal claims. Because we conclude that plaintiffs have made no showing of a physician-patient relationship with any remaining defendant, which relationship is necessary to support a medical malpractice claim, and that plaintiffs have made no showing of a clearly established state property

---

[1] All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

[2] Numerous defendants were voluntarily dismissed by stipulation both before and after the circuit court's decision on defendants' summary judgment motion. Additionally, appellants have chosen not to appeal the circuit court's decision as to many other defendants. Consequently, this appeal involves the appeal of claims against only the following defendants: Michael Rock, Norman C. Fost, Philip M. Farrell, Elaine H. Mischler, Richard A. Aronson and Anita Laxova.

right or a clearly established state or federal liberty interest that any named defendant's conduct violated, we affirm the judgment and order of the circuit court.

## BACKGROUND

¶ 2. C.E.A. was born to Linda and Charles Ande on July 13, 1993. There was then ongoing a cystic fibrosis research project which had begun in 1985. Philip Farrell and Norman Fost were the co-investigators. To test for the presence of factors indicative of cystic fibrosis, the study used excess blood that had been drawn from all newborns to conduct statutorily required tests for the presence of other congenital and metabolic disorders. The research protocol required that the parents of half of the newborns in the study were told if their child tested positive for cystic fibrosis. A nutritional plan was made available to them immediately, as it was the researchers' theory that treating the nutritional needs of children with cystic fibrosis before they became symptomatic would result in a less vigorous development of the disease with fewer impairments to overall health. The other half of the children who were tested were placed in the "blinded control" group. Their parents and their treating physicians were not told if they had tested positive for factors indicative of cystic fibrosis. C.E.A. was placed in the blinded group, and therefore, her parents and her primary physician, Dr. Amy Plumb, were not told that she had tested positive.

¶ 3. Prior to testing the blood of newborns for cystic fibrosis, a pamphlet was prepared that told about the different tests that were required to be completed on newborns' blood. It also told of the cystic fibrosis test that would be run as part of a research project. It described the dangers of cystic fibrosis and stated that

cystic fibrosis was an inherited disorder. The pamphlet also arguably implied that positive test results would be reported to the infant's physician, and a phone number was listed for parents who wanted additional information about the test.[3] There is no assertion that the Andes were asked for or gave specific, written consent to have the cystic fibrosis test run on C.E.A. or to have the results of that test go unreported to them.

¶ 4. Subsequent to birth, C.E.A. had difficulties thriving. On June 23, 1995, when C.E.A. was almost two years old, she was diagnosed with cystic fibrosis. At the time that the Andes learned that C.E.A. had cystic fibrosis, Linda Ande was pregnant with a second child. The Andes' second child, C.L.A., is also afflicted with cystic fibrosis.

¶ 5. In this lawsuit, the Andes' allegations may be summarized into the assertion that the defendants committed three wrongful acts that give rise to the Andes' various claims: (1) The cystic fibrosis test was run without their informed consent; (2) treatment was withheld from C.E.A. when the investigators had knowledge that nutritional treatment would reduce the severity of her cystic fibrosis; and (3) C.E.A.'s test results were withheld from them. They allege to have

---

[3] The brochure was revised numerous times, with differing disclosures listed in each version. The edition that plaintiffs' attorneys aver was presented to the Andes states:

> One-half of the blood samples are tested for CF before the babies are one month old. The remaining blood samples are partially tested at this time. Testing on these blood samples is completed when the children are 4 years old. Positive test results are reported to your child's doctor.

> If the CF research test is done, you may contact your doctor, certified nurse-midwife, or the CF specialist at (608) 263–8555 for the result.

been harmed by these acts in two ways: (1) If they had been given the test results, they would have accepted treatment for C.E.A. to lessen the severity of the progression of her illness; and (2) if they had been given the test results, they would not have conceived C.L.A. They do not identify any harm they suffered from the alleged lack of informed consent to run the test in the first instance.

¶ 6. In response, the defendants assert that they did not test C.E.A.'s blood without the Andes' knowledge and consent. They also contend that although all the children in the blinded control group were tested as newborns, no one reviewed the test results for the control group, some of which were negative and some of which were positive for factors indicative of cystic fibrosis. Therefore, the defendants contend they did not withhold information from the Andes.[4] The defendants also raised many affirmative defenses, including failure to state a claim and qualified immunity.

¶ 7. After some discovery had been completed, the defendants moved for summary judgment, which the circuit court granted. It concluded that the plaintiffs gave Wis. Stat. § 893.82(3) notice too late to preserve their state claims, except for medical malpractice,[5] and

---

[4] There is a clear factual dispute on what defendants knew and when they knew it, but it relates only to the plaintiffs' state claims such as the alleged breach of the researchers' duty to warn. Because the plaintiffs have not appealed the circuit court's decision that notice of claim was given more than 120 days after these state claims arose, this factual dispute is not material to the disposition of the appeal.

[5] A notice of claim for medical malpractice against these defendants could have been filed up to 180 days after it arose. Wis. Stat. § 893.82(5m). A notice of claim for other types of

375

that the Andes' medical malpractice claims could not proceed because none of the remaining defendants had a physician-patient relationship with any plaintiff. The circuit court also dismissed plaintiffs' federal claims on the basis of qualified immunity. The plaintiffs moved for reconsideration and the circuit court denied their motion. The plaintiffs appeal only the dismissal of their medical malpractice claims and their federal claims.

## Standard of Review.

■

¶ 8. It is well established that we apply the same summary judgment methodology as the circuit court. *Smith v. Dodgeville Mut. Ins. Co.*, 212 Wis. 2d 226, 232, 568 N.W.2d 31, 34 (Ct. App. 1997). We first examine the complaint to determine whether it states a claim,[6] and then we review the answer to determine whether it joins a material issue of fact or law. *Id.* If we conclude that the complaint and answer are sufficient to join issue, we examine the moving party's affidavits to determine whether they establish a *prima facie* case for summary judgment. *Id.* at 232–33, 568 N.W.2d at 34. If they do, we look to the opposing party's affidavits to determine whether there are any material facts in dispute which entitle the opposing party to a trial. *Id.*

---

negligence must have been filed within 120 days. Section 893.82(3). This longer period for filing a notice of claim under subsection (5m) was the basis for the circuit court's conclusion that the notice of claim for medical malpractice was timely.

[6] For example, whether the allegations in the complaint are sufficient to give rise to a physician-patient relationship supportive of a malpractice claim is a question of law we review *de novo*.

¶ 9. Whether the Andes have shown the existence and deprivation of a clearly established right by citing "closely analogous" cases that would give a reasonable public official notice that his or her actions clearly violated a right protected by the United States Constitution or by a federal statute is also a question of law. *See Hunter v. Bryant*, 502 U.S. 224, 227–28 (1991) (per curiam); *Burkes v. Klauser*, 185 Wis. 2d 308, 327–32, 338–39, 517 N.W.2d 503, 511–13, 516 (1994).

**Medical Malpractice.**

¶ 10. Medical malpractice arises when a physician fails to exercise that degree of care and skill usually employed by the average practitioner under similar circumstances. *See Johnson v. Misericordia Cmty. Hosp.*, 97 Wis. 2d 521, 543–44, 294 N.W.2d 501, 513 (Ct. App. 1980), *aff'd*, 99 Wis. 2d 708, 301 N.W.2d 156 (1981). Whether a suit for malpractice will lie against a specific physician depends upon whether there is a physician-patient relationship between that physician and the complainant. *See, e.g., Froh v. Milwaukee Med. Clinic, S.C.*, 85 Wis. 2d 308, 311, 270 N.W.2d 83, 84 (Ct. App. 1978). A physician-patient relationship is a trust relationship, created when professional services are provided by a physician and accepted by a patient. *See Brown v. Dibbell*, 227 Wis. 2d 28, 46–47, 595 N.W.2d 358, 368 (1999). Only a physician "who treats a patient" is charged with a statutory duty to inform the patient about treatment modalities and the benefits and risks of those treatments. Wis. Stat. § 448.30.

¶ 11. Our summary judgment review starts with an examination of the Second Amended Complaint relative to the physicians against whom the Andes maintain claims in this appeal. While the first claim for relief is styled "MEDICAL MALPRACTICE," the substantive allegations of wrongdoing focus only generally on "the defendants." Paragraph 41 alleges "negligence" due to the "failure to obtain informed consent from the Andes before proceeding with the study and [the] failure to timely diagnos[e][7] and inform the Andes that C.E.A. had cystic fibrosis." (Footnote added.) Paragraph 40 also incorporates all allegations made in paragraphs 1–39, none of which describes the provision or receipt of medical services or the request for services that were not provided. The general tenor of those paragraphs is that defendants had information that they had a duty to disclose to plaintiffs. In sum, the medical malpractice claim is based on the alleged failure to obtain informed consent to run the test in the first instance and the failure to provide information after it was run. However, even if we were to assume *arguendo* that the researchers had a duty to obtain informed consent from the Andes, that the pamphlet that was provided was insufficient to do so, and that the researchers had a duty to share what information was available to them with the Andes, there is no allegation in the complaint of any relationships between the Andes and any of the researchers from which one could conclude that such

---

[7] This part of the claim was initially focused on Dr. Amy Plumb and others who treated C.E.A. However, Dr. Plumb was dismissed by stipulation prior to the circuit court's decision on summary judgment, and the Andes have accepted the dismissal of all of the other physicians who were involved in C.E.A.'s treatment.

duties arose from a physician-patient relationship, rather than from ordinary negligence principles.

¶ 12. Additionally, uncontradicted materials submitted in the circuit court by the respondents during the summary judgment proceedings show that Aronson is the Chief Medical Officer for Family and Community Health for the Wisconsin Division of Public Health within the Wisconsin Department of Health and Family Services. He was not engaged in the practice of medicine, did not render primary care to any patients and had no authority or responsibility to direct or control the cystic fibrosis research study which is central to this lawsuit. All of the remaining defendants appear to have been connected with the cystic fibrosis research project in some manner, but they had no relationship with the Andes. For example, Farrell was the Dean of the University of Wisconsin Medical School and, together with Fost, was a co-investigator for the cystic fibrosis study. Plaintiffs have provided no affidavit or other evidentiary proof to show any physician-patient relationship between the Andes and any defendant who is subject to this appeal. Accordingly, we conclude that the circuit court correctly dismissed plaintiffs' claims for medical malpractice.

**Federal Claims.**

¶ 13. The Andes' federal claims invoke 42 U.S.C. § 1983 (1994).[8] They claim a due process viola-

_____

[8] 42 U.S.C. § 1983 (1994) provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

tion because the defendants deprived them of their liberty and property interests by arbitrarily placing C.E.A. in the blinded control group of the cystic fibrosis study and by withholding her test results from them for almost two years, during which time beneficial treatment was withheld from C.E.A. and the Andes conceived another child who also has cystic fibrosis. The respondents contend that the Andes' claims may not proceed because they are protected by qualified immunity.

### 1. 42 U.S.C. § 1983 overview.

¶ 14. Section 1983, in and of itself, does not create substantive rights; rather, it provides a remedy for the deprivation of rights that are established elsewhere. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617–18 (1979). In a § 1983 claim that alleges a violation of either procedural or substantive due process, a plaintiff must show a deprivation of an interest in life, liberty or property that is protected by the Constitution. *Penterman v. Wisconsin Elec. Power Co.*, 211 Wis. 2d 458, 473, 565 N.W.2d 521, 533 (1997). Although the Andes allege the deprivation of substantive rights, based on what they characterize as the withholding of medical information about C.E.A., they are not clear about whether their due process claims implicate a property interest or a liberty interest.[9] We will examine each interest in turn.

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[9] Paragraph 34 of the Second Amended Complaint alleges that "[t]he Andes had a property and/or liberty interest in knowing that C.E.A. was being placed in the study at the time she was placed in it; in knowing the nature of the study and the ramifications of participation before C.E.A. was placed in the

## 2. Qualified immunity overview.

¶ 15. Qualified immunity may preclude claims against a government official for the performance of discretionary functions if the official's conduct does not violate a clearly established federal statutory or constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Penterman*, 211 Wis. 2d at 469, 565 N.W.2d at 528. Additionally, even though qualified immunity is an affirmative defense, a plaintiff must be able to demonstrate by closely analogous case law that the defendant's alleged conduct constituted a violation of a federal statutory or constitutional right that was clearly established at the time the acts occurred. *Penterman*, 211 Wis. 2d at 469, 565 N.W.2d at 528. Accordingly, if a reasonable person in the position of the defendants could have believed that the manner in which he or she conducted the cystic fibrosis study did not violate the plaintiffs' rights at the time the test on C.E.A. was conducted and that not informing the Andes of the test results until 1995 did not violate the Andes' liberty or property interests, qualified immunity protects the defendants from liability arising from the Andes' claims brought under federal law. *See Hunter*, 502 U.S. at 227–28. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who

study; and in knowing that she had cystic fibrosis at or near the time that diagnosis was made." In paragraph 75, the Andes allege that they were denied "their property right to information about C.E.A.'s medical condition (cystic fibrosis)." And paragraph 76 alleges that the defendants denied the Andes' children their "respective liberty interests in maintaining their health and their bodily integrity."

knowingly violate the law.' " *Id.* at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

### 3. Violation of a clearly established right.

#### a. Property interest.

¶ 16. The first step in our analysis is to determine whether the Andes had a substantive property right to receive the results of C.E.A.'s cystic fibrosis test at or near the time it was performed. *See Arneson v. Jezwinski*, 225 Wis. 2d 371, 386, 592 N.W.2d 606, 613 (1999). Substantive property interests are created exclusively under state law. *Id.* Therefore, in order to determine whether the Andes had a substantive property interest in the test results, we look to Wisconsin law. However, federal constitutional law determines whether a state-created property interest rises to a "legitimate claim of entitlement" under the Due Process Clause of the United States Constitution. *Id.* (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)). Federal law also determines how much procedural due process must be provided before one may be deprived of a protected property right. *Arneson*, 225 Wis. 2d at 386, 592 N.W.2d at 614.

¶ 17. Because a qualified immunity analysis examines the status of the right asserted at the time it was allegedly denied, we must determine whether prior to June 26, 1995,[10] the Andes had a property right under Wisconsin law, that was then clearly established,

[10] The Andes learned the results of C.E.A.'s initial cystic fibrosis test on June 26, 1995; however, she was diagnosed with cystic fibrosis on June 23, 1995, through tests run on that date.

to have received the test results. The Andes have cited no Wisconsin case to us which holds that they had a property interest in the test results of the cystic fibrosis study, nor have they cited any cases which are closely analogous. Additionally, our research has uncovered no such Wisconsin case that predates the disclosure of the information to the Andes in 1995. Accordingly, we conclude there was no such property right under Wisconsin law that was clearly established prior to June 26, 1995 when the test results were disclosed. Accordingly, the Andes have failed to establish the first step necessary to a due process claim based on the deprivation of a clearly established property right and therefore, their claim in this regard was properly dismissed.

*b. Liberty interest.*

¶ 18. The Andes also allege a constitutional violation of a liberty interest based on the failure to obtain informed consent for the testing that was done, as well as on the alleged failure to disclose information. Liberty interests may arise under either state[11] or federal[12] law. For example, the Fourteenth Amendment of the United States Constitution protects an "individual interest in avoiding disclosure of personal matters." *Hillman v. Columbia County*, 164 Wis. 2d 376, 400, 474 N.W.2d

---

[11] *See State ex rel. Gendrich v. Litscher*, 2001 WI App 163, ¶ 6, 246 Wis. 2d 826, 632 N.W.2d 878 (state liberty interests are decided on a case-by-case basis).

[12] *See Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278 (1990) (a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment); *Harris v. McRae*, 448 U.S. 297, 311–12 (1980) (liberty interests protected by the Due Process Clause include a freedom of personal choice in certain matters of marriage and family life).

913, 922 (Ct. App. 1991) (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977)). This personal liberty interest arises from a "guarantee" under federal law of certain zones of privacy. *Roe*, 429 U.S. at 598–600 & n.23. The Supreme Court has also recognized that there is a constitutionally protected liberty interest in bodily integrity and in the right to determine what medical treatment shall be accepted or refused, *see Washington v. Glucksberg*, 521 U.S. 702, 777 (1997) (Souter, J., concurring), and that parents have a constitutionally protected right to obtain needed medical treatment for their child so long as the child's rights are protected by the process employed. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979). While neither the Wisconsin Supreme Court nor the United States Supreme Court has yet addressed whether there is a constitutionally protected liberty interest in receiving information from a research project relative to one's genetic predisposition to give birth to a child with a genetically transmitted disorder or in receiving information from a research project that would assist a parent in making informed health care choices for his or her child, we cannot say with certainty that the withholding of the results of C.E.A.'s test did not implicate a liberty interest in either the parents or C.E.A. Therefore, for purposes of our discussion we shall assume, without deciding, that a liberty interest could be established if this case were to go to trial.

¶ 19. Once a liberty interest has been established, it may not be denied without a constitutionally acceptable amount of procedural due process. *Arneson*, 225 Wis. 2d at 399, 592 N.W.2d at 619. In regard to the alleged failure to obtain informed consent before the cystic fibrosis test was run in the first instance, the Andes base none of their claimed injuries on an unau-

thorized disclosure of private information, as they might if the researchers had disclosed C.E.A.'s condition to third parties. And they identify no harm that they suffered by not giving consent to the test in the first instance. For example, they do not allege that they would not have permitted the test if they had known it was being conducted. Instead, all of their alleged injuries flow from not having the *results* of the test at or near the time it was conducted. Therefore, we will not address their claims in regard to an alleged lack of informed consent further.[13]

¶ 20. We now turn to the alleged failure to timely disclose the results of C.E.A.'s cystic fibrosis test. The closest the Andes come in making an argument that the alleged failure to disclose was a clear violation of their rights is to contend that one of the defendants, Richard Aronson, as the Medical Director for the Wisconsin Newborn Screening Program conducted under the direction of the Wisconsin Department of Health and Family Services, had a statutory duty under WIS.

---

[13] We note that developing appropriate recommendations for obtaining adequate informed consent when gathering tissue samples that may later be used for genetic studies and determining when additional consent should be required for tissue samples already collected have been the subject of some debate. *See Ellen Wright Clayton et al.,* Informed Consent for Genetic Research on Stored Tissue Samples, 274 JAMA 1786 (1995). Additionally, at the time relevant to the Andes' claims, federal law permitted certain research on some types of tissue samples without informed consent, if the tissue samples had already been collected and the subjects from whom the samples had been obtained could not be identified. *See* 45 C.F.R. § 46.101(b)(4) (1994).

STAT. § 253.13(5) to disclose the results of the testing for congenital disorders. Section 253.13(5) stated in relevant part:

> The department shall disseminate information to families whose children suffer from congenital disorders and to women of child-bearing age with a history of congenital disorders concerning the need for and availability of follow-up counseling and special dietary treatment and the necessity for testing infants. The department shall also refer families of children who suffer from congenital disorders to available health and family services programs and shall coordinate the provision of these programs. The department shall periodically consult appropriate experts in reviewing and evaluating the state's infant screening programs.

In 1993, the year C.E.A. was born, WIS. ADMIN. CODE § HSS 115.04 (1993) set out the tests to be done and for which information was required to be provided under § 253.13. Cystic fibrosis was not then a required test under § HSS 115.04.[14] By emergency rule, effective January 31, 1995,[15] cystic fibrosis was added to the list of tests that were required to be performed on newborns, *see* § HSS 115.04 (1995), and the Andes were not given C.E.A.'s test results until mid-1995. However, even if we were to conclude that § 253.13 could be construed to implicate a liberty interest in receiving the

___

[14] In 1993, Wisconsin law required screening of all newborns in the state for biotinidase deficiency, congenital adrenal hyperplasia, congenital hypothyroidism, galactosemia, phenylketonuria and sickle cell disease. *See* WIS. STAT. § 253.13 (1993–94); WIS. ADMIN. CODE § HSS 115.04 (1993).

[15] According to Aronson's deposition testimony and affidavit, routine screening for cystic fibrosis actually commenced in April 1994, which was several months prior to the effective date of the emergency rule.

results of a cystic fibrosis test conducted a year before the testing and reporting of the results became mandatory, the failure to disclose cannot be said to rise to the level of a violation of a "clearly established" right because there is no closely analogous case law which interprets § 253.13 to require the disclosure of tests run before the statute and applicable administrative rules required them.

¶ 21. The Andes also allege a "general" violation of substantive due process, claiming that the actions of the defendants were arbitrary and capricious in the way in which they selected C.E.A for the control group and failed to disseminate the information they had about her. Substantive due process protects individuals from arbitrary, wrongful, governmental actions regardless of the process afforded prior to the deprivation. *Penterman*, 211 Wis. 2d at 480, 565 N.W.2d at 533. The Supreme Court has repeatedly explained that the touchstone of substantive due process is the protection of the individual against arbitrary action of government. *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). Substantive due process protects against governmental actors who engage in conduct that "shocks the conscience" or conduct that interferes with rights "implicit in the concept of ordered liberty." *Id.* at 846–47 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). However, even so generalized a claim of protection still requires the identification of a clearly protected interest that the actor's conduct violates. Due process claims are not a substitute for general tort claims. *Lewis*, 523 U.S. at 846 n.8. The Andes have failed to identify any Wisconsin or federal case law

clearly establishing such an interest. Therefore, we conclude that qualified immunity bars all their federal claims.[16]

## CONCLUSION

¶ 22. Because we conclude that plaintiffs have made no showing of a physician-patient relationship with any remaining defendant, which relationship is necessary to support a medical malpractice claim, and that plaintiffs have made no showing of a clearly established state property right or a clearly established state or federal liberty interest that any named defendant's conduct violated, we affirm the judgment and order of the circuit court.

*By the Court.*—Judgment and order affirmed.

---

[16] The Andes do not address the circuit court's denial of their motion for reconsideration as a separate argument. Therefore, we conclude that there was no erroneous exercise of discretion in denying the motion, for the reasons stated above.