# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP333 |

| | |
|---|---|
| COMPLETE TITLE: | Erik A. Andrade, Petitioner-Appellant-Petitioner, v. City of Milwaukee Board of Fire and Police Commissioners, Respondent-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 390, 965 N.W.2d 178
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED: | April 30, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 9, 2023 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Jeffrey A. Conen |

JUSTICES:
HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined.
NOT PARTICIPATING:

ATTORNEYS:
For the petitioner-appellant-petitioner, there were briefs filed by *Brendan P. Matthews* and *Cermele & Matthews, S.C., Milwaukee*. There was an oral argument by *Brendan P. Matthews*.

For the respondent-respondent, there was a brief filed by *Stacie H. Rosenzweig* and *Halling & Cayo, S.C., Milwaukee*. There was an oral argument by *Stacie H. Rosenzweig*.

An amicus curiae brief was filed by *Scott B. Thompson, T.R. Edwards*, and *Law Forward, Inc., Madison*, on behalf of Black Leaders Organizing for Communities.

An amicus curiae brief was filed by *William E. Fischer, Kyle J. Gulya*, and *Von Briesen & Roper, S.C., Neenah*, on behalf of League of Wisconsin Municipalities.

An amicus curiae brief was filed by *Jonathan Cermele* and *Cermele Law, S.C., Milwaukee*, on behalf of Milwaukee Police Association and Green Bay Professional Police Association.

2024 WI 17

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP333
(L.C. No. 2019CV564)

STATE OF WISCONSIN : IN SUPREME COURT

**Erik A. Andrade,**

      **Petitioner-Appellant-Petitioner,**

    **v.**

**City of Milwaukee Board of Fire and Police Commissioners,**

      **Respondent-Respondent.**

**FILED**

**APR 30, 2024**

Samuel A. Christensen
Clerk of Supreme Court

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 BRIAN HAGEDORN, J. Former Milwaukee Police Officer Erik Andrade challenges his termination for a series of posts and comments he made on Facebook. The posts garnered significant local and national attention following a civil rights lawsuit that brought them to light. As part of its internal investigation into the posts, the Milwaukee Police Department informed Andrade of the policies he potentially

violated and scheduled an interview. During that interview, Andrade reviewed and read the relevant portions of those policies out loud. The investigator then questioned Andrade about the posts, one by one. Andrade was afforded the opportunity to respond to their intended meaning, his understanding of how they might be received by the public and affect the Department's work, and whether he believed they violated Department policy.

¶2 Following the internal investigation, the Department formally charged Andrade with violating two policies. Both charges cited Andrade's posts as the basis for the violations. The responsibility then shifted to Chief of Police Alfonso Morales to determine his guilt and impose the appropriate punishment. The Chief had internal affairs reach out to the Milwaukee County District Attorney's Office, which explained that Andrade's posts would diminish his credibility in court so severely that they would no longer use him as a witness. Given the critical importance of testifying in police work, this fact convinced the Chief that termination was appropriate. The Chief formally found Andrade guilty of the charges and discharged him for one of them. The Chief filed a complaint containing the same charges and allegations with the entity that reviews his decision——the Board of Fire and Police Commissioners. Neither the initial charges, the Chief's order of discharge, nor the complaint with the Board mentioned Andrade's inability to testify.

2

¶3 After a full evidentiary trial, the Board issued a detailed decision determining that Andrade was guilty of the violations and the punishments he received were appropriate. Andrade then filed two actions in the circuit court. The first——a statutory appeal under Wis. Stat. § 62.50(20) (2017-18)[1]——focused on whether there was just cause to sustain the charges.[2] The second——a petition for a writ of certiorari——alleged that the Board committed legal and jurisdictional errors. The circuit court upheld the Board's decision, Andrade appealed on his certiorari petition, and the court of appeals affirmed.

¶4 Before us, Andrade challenges his termination on procedural grounds. First, he contends it fell short of the Fourteenth Amendment's due process guarantee. He argues that due process required the Department to explain why Chief Morales terminated him instead of imposing a lesser form of discipline. As such, the Department should have told him that Chief Morales made his decision based on the DA's determination that they would no longer use Andrade as a witness. Andrade insists that the Department's failure to tell him this prior to termination means he was not given an explanation of the evidence supporting

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

[2] Wisconsin. Stat. § 62.50(20) reads in part: "Any officer or member of either department discharged, suspended or reduced, may, within 10 days after the decision and findings under this section are filed with the secretary of the board, bring an action in the circuit court of the county in which the city is located to review the order."

3

his termination in violation of the United States Supreme Court's decision in Cleveland Board of Education v. Loudermill.[3]

¶5   The law does not support Andrade's claim. For public employees terminable only for cause, Loudermill generally entitles a terminated employee to notice of the charges, an explanation of the evidence supporting them, and some pre-termination opportunity to respond. The scope and nature of the pre-termination procedures can vary depending on the nature of the post-termination proceedings and the interests that are implicated. The Fourteenth Amendment's due process guarantees in this context are not rigid and formal; they are flexible, giving employers wide latitude on the process and nature of the notice due when terminating employees.

¶6   Here, the Department notified Andrade of his conduct (the Facebook posts) and what policies this conduct violated. The Department provided Andrade an opportunity to respond to the allegations before the Chief imposed punishment. The Chief's decision to terminate was confirmed after a full administrative hearing before the Board, as well as judicial review of the Board's decision. We conclude the Due Process Clause does not require a more exacting and rigid pre-termination process than what Andrade received.

¶7   Andrade's second argument is that Chief Morales's complaint did not comply with Wis. Stat. § 62.50(13) because it did not sufficiently explain the reasons for the discharge.

---

[3] 470 U.S. 532 (1985).

4

However, the complaint listed the policies Andrade violated and referenced the Facebook posts that formed the basis for the violations.  The statute requires nothing more.

## I.  BACKGROUND

¶8  On January 26, 2018, Milwaukee police officers arrested Milwaukee Bucks player Sterling Brown, using force and shocking him with a Taser.  Officer Erik Andrade transported Brown to the police station after his arrest.  Later that day, Andrade posted about the encounter on his personal Facebook page.[4]  Over the following months, Andrade posted a number of other "inappropriate, disrespectful and defamatory comments"——as the Chief would later describe them——on Facebook.

¶9  Sometime later, a member of the City of Milwaukee Common Council shared Andrade's posts with the Department.  The Department's Internal Affairs Division opened an investigation in May.  Things escalated on June 19 when Sterling Brown sued the City, Chief Morales, and the police officers present at the scene of his arrest, including Andrade.  Brown's complaint cited many of Andrade's offensive posts as an admission that Andrade and other officers could engage in "unlawful attacks and arrests of African Americans without justification" or a "fear of real discipline."  That same day, the Milwaukee Journal Sentinel

---

[4] Andrade posted the following:  "Nice meeting Sterling Brown of the Milwaukee Bucks at work this morning!  LOL#FearTheDeer."  "Fear the Deer" is a popular slogan for the Milwaukee Bucks.

5

published an article about the lawsuit featuring Andrade's posts.

¶10 The day after Brown filed the lawsuit, an officer from Internal Affairs called Andrade to inform him that they were investigating allegations he posted inappropriate content on social media. Internal affairs also sent Andrade a written notice, which he signed, that summarized several of the offending posts and referenced two Department policies (called "Core Values") that his conduct implicated.[5] The notification further warned, "Disciplinary action may result," and set the date Andrade was "required to provide verbal responses and/or 'Memorandum' Reports(s)."[6]

¶11 Internal Affairs interviewed Andrade on June 28. During the interview, investigators asked Andrade to read aloud

---

[5] The Department summarized the posts as follows: "The Milwaukee Police Department is presently investigating you concerning an allegation-That you allegedly posted an inappropriate comment regarding your on-duty contact with Milwaukee Bucks basketball player Mr. Sterling Brown on social media. It is also alleged that you posted other inappropriate comments to include one with a picture of NBA Basketball player Kevin Durant, a shared post from a Facebook account that alleged that African Americans lie to police, a comment celebrating overtime pay accompanying a use of force, comments via your Facebook account regarding innocent African Americans, police brutality and mass incarceration, and a comment regarding Cleveland Cavaliers NBA basketball player JR Smith."

[6] The parties state that in response, Andrade filed a "written response to charges." Several witnesses at the hearing before the Board referenced it as well. However, a copy does not appear to be in the record.

6

relevant portions of the Department policies he was given notice of earlier.

¶12 The first policy violation concerned social media use. This was based on Core Value 1.00 (entitled "Competence") referencing "Guiding Principle" 1.05. Core Value 1.00 reads: "We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performance and the standards of our conduct. We are exemplary leaders and exemplary followers." Guiding Principle 1.05 provides: "All department members shall be familiar with department policy, procedures and training and shall conduct themselves accordingly." Investigators therefore had Andrade read portions of the Department's social media policy during the interview. Andrade read Standard Operating Procedure 685.15(A)(5), which provides: "As public employees, members do not lose their rights under the First Amendment of the U.S. and Wisconsin constitutions. However, speech, on or off duty, pursuant to your official duties and professional responsibilities as members of the Milwaukee Police Department is not protected. Members are free to express themselves as private citizens on [social media sites] to the degree that their speech is not disruptive to the mission of the department." Andrade also read Standard Operating Procedure 685.15(A)(10): "Members must be aware that their communication on [social networking sites] can be used by a skilled defense

7

attorney in impeaching testimony in association with their professional duties as a member of the department."[7]

¶13 In addition to the social media policies, Andrade was also asked to read Core Value 3.00 (entitled "Integrity") and Guiding Principle 3.01. Core Value 3.00 reads: "We recognize the complexity of police work and exercise discretion in ways that are beyond reproach and worthy of public trust. Honesty and truthfulness are fundamental elements of integrity. It is our duty to earn public trust through consistent words and actions. We are honest in word and deed." Andrade also recited Guiding Principle 3.01: "Our behavior shall inspire and sustain the confidence of our community. Whether on or off duty,

---

[7] Andrade insists that he had no idea his ability to testify was relevant to his discipline. He suggests this warning only pertained to the violation of Core Value 1.00, which he is not appealing, and for which he was suspended, not terminated. And even then, Andrade says, he was only on notice that a skilled defense attorney could use his postings for impeachment, not that he wouldn't be able to testify at all.

The record paints a much different picture. All of this was investigated together——same documents, same interview, based on the same Facebook posts——before the Chief imposed discipline. Andrade was well aware that his credibility as a witness was relevant to the investigation over his posts.

In addition, Andrade took down his Facebook page the very day Brown filed his lawsuit. He said he felt that he was being made to "look a certain way"; he was being "portrayed as a racist in the media nationwide." Andrade's posts were all over CNN, ESPN, and sports outlets of all kinds. Andrade testified, "I'm seeing my name everywhere, I'm getting calls from everybody." It is hard to imagine that a police officer facing this magnitude of criticism would fail to consider the possibility that it could affect his ability to serve as a credible witness.

department members shall not behave in such a way that a reasonable person would expect that discredit could be brought upon the department, or that it would create the appearance of impropriety or corruptive behavior." Andrade acknowledged he was familiar with these policies.

¶14 The investigator then reviewed each post with Andrade, one by one. He asked standard questions such as whether Andrade made the post, what the post meant, why he posted it, how it might be received by the public, whether he regretted posting it, and whether he thought it violated Department policy. Generally, Andrade admitted the posts were his and explained that they were designed to educate, enlighten, and/or be humorous. Although he acknowledged they could be seen as unprofessional by some, he did not believe they violated Department policy.

¶15 On August 23, 2018, the Department officially charged Andrade with violating the same Core Values and Guiding Principles he was put on notice of prior to and during his interview. The first charge alleged that Andrade violated Core Value 1.00; the second alleged that Andrade violated Core Value 3.00. Both violations were a result of Andrade's Facebook posts that contained "inappropriate, disrespectful and defamatory comments to various memes and videos."

¶16 This put the ball in the court of Chief of Police Alfonso Morales. Chief Morales had to determine whether to find Andrade guilty of the charges and what discipline to impose. The Chief had Internal Affairs reach out to the Milwaukee County

District Attorney's Office and asked whether Andrade's posts would affect his credibility as a witness. They said yes. The comments diminished his credibility so severely that the office would never call him to testify. Even more, Kent Lovern, the second in command at the DA's Office, stated that the posts would fall into the category of Brady material.[8] This means that if Andrade served as a witness in a criminal proceeding, the District Attorney's Office would be required to disclose evidence of Andrade's bias and untrustworthiness to defense counsel as impeachment evidence.

¶17 Lovern would later testify before the Board that his office added Andrade to an internal list of officers subject to such disclosures. The list contained three categories of officers: (1) never call as a witness; (2) call with qualifications; and (3) call anytime, but disclose. Andrade fell into the first category. Lovern testified that the DA's office would not prosecute cases relying primarily on the testimony of officers placed into the do not call category.

¶18 This was of grave concern to Chief Morales. He believed that the ability to testify was an "extremely important" aspect of policing. He likened it to Detective Mark Fuhrman in the trial of O.J. Simpson, whose use of racist terms significantly damaged his credibility. The mere presence of an

---

[8] If a witness previously behaved in a way that harms his or her credibility, the prosecutor is constitutionally required to turn evidence of this behavior over to the defendant. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972).

officer unable to testify on an investigation could stymie or taint a later prosecution. Chief Morales therefore determined that while he would have handed down a severe punishment regardless, the inability to testify changed the calculus and persuaded him that termination was appropriate.

¶19 On September 12, 2018, almost three weeks after the Department issued formal charges, Chief Morales issued an order that found Andrade guilty of the charges and imposed discipline. The Chief suspended Andrade for 30 days without pay for "[p]osting content to a social networking site that was disruptive to the mission of the department."[9] And for the charge of "Failure to inspire and sustain the confidence of our community,"[10] the Chief discharged him from the Department. The order did not explain the reasoning for the chosen level of discipline.

¶20 The Chief's decision, however, is not the final word. Wisconsin law requires Milwaukee to establish a Board of Fire and Police Commissioners. Wis. Stat. § 62.50(1h). One of the Board's duties is to review a police chief's disciplinary decisions. Wis. Stat. § 62.50(17). After the chief discharges or suspends an officer for more than five days, he must file his written notice of discharge with the Board along with a

---

[9] Andrade violated "Core Value 1.00-Competence, referencing Guiding Principle 1.05, referencing Standard Operating Procedures relating to Social Networking Sites (SNS), Section 685.15(A)(5)."

[10] Andrade violated "Core Value 3.00-Integrity, referencing Guiding Principle 3.01."

11

complaint "setting forth the reasons for the discharge or suspension." Wis. Stat. § 62.50(13). The discharged officer then may choose to appeal the chief's decision to the Board. Id. In that case, the Board holds a trial where the discharged officer "shall have full opportunity to be heard in defense and shall be entitled to secure the attendance of all witnesses necessary for the defense at the expense of the city." Wis. Stat. § 62.50(16). In the end, the Board is tasked with determining whether there is "just cause" to sustain the charges and, if so, what discipline to impose. Wis. Stat. § 62.50(17)(a)-(b). It does so by analyzing and applying seven standards set forth in the statutes.[11] Wis. Stat. § 62.50(17)(b).

¶21 Accordingly, Chief Morales filed a complaint with the Board, listing the two violations and the punishment for each. The complaint stated that Andrade's Facebook posts were the

---

[11] They are: (1) "Whether the subordinate could reasonably be expected to have had knowledge of the probable consequences of the alleged conduct"; (2) "Whether the rule or order that the subordinate allegedly violated is reasonable"; (3) "Whether the chief, before filing the charge against the subordinate, made a reasonable effort to discover whether the subordinate did in fact violate a rule or order"; (4) "Whether the effort described under subd. 3. was fair and objective"; (5) "Whether the chief discovered substantial evidence that the subordinate violated the rule or order as described in the charges filed against the subordinate"; (6) "Whether the chief is applying the rule or order fairly and without discrimination against the subordinate"; and (7) "Whether the proposed discipline reasonably relates to the seriousness of the alleged violation and to the subordinate's record of service with the chief's department." Wis. Stat. § 62.50(17)(b).

12

basis for both violations. Andrade appealed the Chief's decision to the Board, and in December 2018, a hearing examiner presided over a two-day trial before a panel of three commissioners.

¶22 The panel split up Andrade's trial into two phases.[12] During phase one, the panel heard evidence and arguments regarding the first five "just cause" standards. Both sides gave opening and closing statements. Both sides called witnesses and conducted direct and cross examinations. And both sides presented exhibits. After each side rested, the panel examined the five standards and concluded that the evidence supported both charges. The panel then moved to the second phase during which it heard evidence and arguments regarding the final two standards, including what discipline to impose. In the end, the panel determined that both the suspension and the

---

[12] Although not relevant to our determination that he received sufficient pre-termination notice, Andrade's actions before and during the trial contradict his argument that he was blindsided by the Chief's testimony about the inability to testify. A month before trial, Andrade's attorney listed Chief Deputy District Attorney Kent Lovern on his witness list, and then subpoenaed the Brady disclosure list created and maintained by the DA's office. During trial, Andrade's attorney extensively questioned Lovern about the list and Andrade's ability to testify. The City continues to point out in briefing that Andrade obviously knew of the list and thought it might be relevant; why else would it be subpoenaed and addressed through cross-examination by Andrade's attorney? Yet Andrade ignores all of this in his briefing and represents he had no idea any of this was relevant.

13

discharge punishments were appropriate.[13]  It issued a written decision memorializing and explaining its determination on January 4, 2019.[14]

¶23  Andrade then filed two appeals to the circuit court——a statutory appeal and a petition for a writ of certiorari——which the court consolidated.  Andrade challenged the panel's decision on several bases.[15]  Relevant here, he argued that the Board did not have just cause to sustain the second charge (for which he was terminated) and that——contrary to the notice mandates of due process and Wis. Stat. § 62.50(13)——he was unaware prior to the hearing that his inability to testify was an issue.

¶24  The court disagreed.  After reviewing the record, the court found substantial evidence to support the panel's just

---

[13] The dissent apparently disagrees.  It spends considerable time suggesting the punishment Andrade received was inappropriate and egregious, selecting and quoting favored testimony from the hearing.  None of this is before us, however.  The Board confirmed the Chief's choice of discipline; it is inappropriate given the procedural posture of this case to second guess this conclusion.

[14] The Board concluded in part:  "Andrade's posts managed to repeat every negative stereotype plaguing big city police departments, i.e., racism, use of excessive force, disregard for ethnic sensitivities, distrust of the public, and incurring excessive overtime.  The negative impact of the posts was magnified by the extensive local and national publicity that followed. . . . We conclude that the posts and comments undermined trust in the department, disrupted the mission of the department, undermined public confidence, discredited the department, and created the appearance of impropriety and corruption in the department."

[15] The Honorable Jeffrey A. Conen of the Milwaukee County Circuit Court presided.

cause decision on the merits. It also held that the Chief complied with the notice requirements of due process and Wis. Stat. § 62.50(13). The Chief did not charge Andrade for his inability to testify; rather, it was an "impact" of the conduct leading to the charges.

¶25 Andrade appealed the court's certiorari decision to the court of appeals, which affirmed. Andrade v. City of Milwaukee Bd. of Fire & Police Comm'rs, No. 2020AP333, unpublished slip op. (Wis. Ct. App. Aug. 31, 2021). Andrade followed with a petition for review to this court, but we held the matter in abeyance pending our decision in Green Bay Professional Police Ass'n v. City of Green Bay, 2023 WI 33, 407 Wis. 2d 11, 988 N.W.2d 664.[16] After deciding Green Bay, we granted Andrade's petition.

## II. DISCUSSION

¶26 The question in this case is whether the Milwaukee Police Department complied with the Fourteenth Amendment's Due Process Clause and Wis. Stat. § 62.50(13) when it terminated Andrade. Procedurally, this question comes to us via

---

[16] Green Bay involved an officer's challenge to an arbitration decision upholding his demotion. Green Bay Pro. Police Ass'n v. City of Green Bay, 2023 WI 33, ¶1, 407 Wis. 2d 11, 988 N.W.2d 664. Before us, the officer claimed he was not afforded sufficient due process under Loudermill. Id., ¶11. We held that the arbitrator did not manifestly disregard the law when he determined that the Department provided adequate notice to the officer. Id. Given the deferential standard of review, Loudermill's requirements were not squarely presented to us. Id., ¶12.

15

certiorari, and in this context, we limit our review to two questions: whether the Board proceeded on a correct theory of law and whether it kept within its jurisdiction.[17] Gentilli v. Bd. of Police and Fire Comm'rs of Madison, 2004 WI 60, ¶21, 272 Wis. 2d 1, 680 N.W.2d 335. Andrade at times argues both, but he does not develop a separate argument as to why the Board exceeded its jurisdiction. Given that we have said proceeding "on a correct theory of law includes complying with the requirements of due process," we will analyze Andrade's claim on this basis and will not separately examine whether the Board exceeded its jurisdiction. Miller v. Zoning Bd. of Appeals of Lyndon Station, 2023 WI 46, ¶9, 407 Wis. 2d 678, 991 N.W.2d 380; see also Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our

---

[17] We normally ask four questions on certiorari: (1) whether the decision-maker "kept within its jurisdiction"; (2) "whether it proceeded on a correct theory of law"; (3) "whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment"; and (4) "whether the evidence was such that it might reasonably make the order or determination in question." Voters with Facts v. City of Eau Claire, 2018 WI 63, ¶71, 382 Wis. 2d 1, 913 N.W.2d 131 (quoting another source). But a statutory appeal under Wis. Stat. § 62.50 permits the circuit court to review the Board's "just cause" determination, and the court's final decision cannot be appealed. Wis. Stat. § 62.50(22); Gentilli v. Bd. of Police and Fire Comm'rs of Madison, 2004 WI 60, ¶14, 272 Wis. 2d 1, 680 N.W.2d 335. Thus, when officers initially file both an appeal under § 62.50 and a petition for a writ of certiorari in the circuit court, appellate courts only review the former two certiorari questions because the latter two mirror the unappealable just cause determination conducted by the circuit court under § 62.50. Gentilli, 272 Wis. 2d 1, ¶21. Accordingly, Andrade only appealed the certiorari decision to the court of appeals and to us.

16

neutral role to develop or construct arguments for parties; it is up to them to make their case.").

## A. Due Process

¶27 We begin with the constitutional challenge. Andrade argues that the Board proceeded on an incorrect theory of law because Chief Morales violated his due process rights when he terminated Andrade without mentioning his inability to testify as a basis for the punishment.

¶28 The Fourteenth Amendment to the United States Constitution provides that states cannot "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish a due process violation, there must first be "a liberty or property interest of which a person has been deprived." Swarthout v. Cooke, 562 U.S. 216, 219 (2011). The Supreme Court has held that a public employee subject to termination only for cause, like Andrade, has a property interest in continued employment. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39 (1985). This is not in dispute. Thus, the question before us is whether the procedures used to deprive Andrade of that interest were constitutionally sufficient. Swarthout, 562 U.S. at 219.

¶29 Since every deprivation is different, the demands of due process vary as well. Mathews v. Eldridge, 424 U.S. 319, 334 (1976). But the Supreme Court has addressed what due process demands in particular situations. Loudermill is one such instance. Loudermill arose as two consolidated cases, the

17

first of which involved an employee who was dismissed for dishonesty but had no opportunity to rebut or respond prior to termination. 470 U.S. at 535. The second case involved a bus mechanic who was dismissed for failing an eye exam, and similarly had no opportunity to respond. Id. at 536, 548. State law provided that both employees could only be terminated for cause. Id. at 535. The Court therefore considered what process the Constitution requires an employer to provide when terminating a public employee who may only be discharged for cause. Id.

¶30 After considering the various interests,[18] the Court concluded that "some kind of hearing" is required before discharging a for-cause employee. Id. at 542. The components of the "hearing" must include "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. at 546. The Court explained that this process "need not be elaborate"——the formality, scope, and procedural requirements

---

[18] The Supreme Court has outlined three factors to guide the determination of what due process requires:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

18

may "vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." Id. at 545; id. at 547 n.12. The point of the pre-termination process is to provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46.

¶31 Andrade's basic contention is that he was not given an explanation of the evidence supporting his discharge prior to his termination.[19] Andrade focuses on the fact that, even though Chief Morales would have disciplined him no matter what, his discipline would not have risen to the level of discharge absent the fact that Andrade could no longer testify.[20] In his eyes,

---

[19] Andrade's briefing is not entirely consistent on when he believes this notice was required. But his reply brief and statements during oral argument make clear that he is focusing on the pre-termination notice—that is, notice prior to his termination on September 12, 2018.

[20] As potential evidence that the inability to testify was simply an after-the-fact rationalization, Andrade represents that he was still testifying up until the date of his discharge. This suffers from three flaws.

First, the record does not support his contention. Andrade cites to an exchange his attorney had with Attorney Lovern during cross-examination where his attorney stated: "I want you to assume that Andrade was chairing a trial up until the day—for your office up until the day he was fired. Would that be inconsistent with your testimony today?" Attorney Lovern said no, because he recalled telling his assistant to put Andrade on the Brady list as soon as he met with members from the Department. Andrade's attorney then said that he could provide "that information after this." Based on this record, he never did. When performing common law certiorari review—which is the case here—we review "the record compiled by the municipality

19

then, his inability to testify constituted evidence against him that the Chief should have disclosed prior to terminating him. Andrade argues he needed this information so that he could make any plausible arguments that might prevent the discipline.

¶32 Not so. Andrade confuses the factors leading to the Chief's choice of discipline with the evidence of the violations in the first place. Chief Morales did not charge Andrade for his inability to testify. As the Chief explained, his conclusions about the policy violations differed from his decision about how to discipline Andrade. Loudermill does not require an explanation of the reasons discharge was the chosen punishment as opposed to suspension or something lesser. Rather, Loudermill just requires an explanation of the basic reasons the employee is being disciplined. Andrade proposes far

---

and [do] not take any additional evidence on the merits of the decision." Ottman v. Town of Primrose, 2011 WI 18, ¶35, 332 Wis. 2d 3, 796 N.W.2d 411. We therefore cannot rely on a representation that is not in the record.

Second, at this stage of the proceedings, we accept the Board's findings of fact——which Andrade does not challenge——as long as "any reasonable view of the evidence supports them." Id., ¶53. In its decision, the Board recounted and credited the testimony of Chief Morales and Attorney Lovern, among others, who testified regarding conversations they had before the termination about Andrade's inability to testify. Accepting Andrade's representation runs contrary to the factual findings of the Board that ground our review.

Finally, even if the DA's Office used Andrade as a witness up till the time of the discharge, that fact is irrelevant to the legal issue before us: whether the pre-termination process was constitutionally sufficient. Whether Andrade actually could be used as a witness or was guilty of violating Department policy is simply not before us.

more rigid, formal, and exhaustive notice requirements than Loudermill commands. Nothing in Loudermill requires an exhaustive pre-termination explanation of every fact or factor that might be considered in the disciplinary process. An employer need not detail all the consequences of an employee's misconduct, nor must it show in detail how those consequences might inform the employer's choice of discipline. The employer must simply notify the employee of the charges and evidence and give them an opportunity to respond. That's exactly what happened here.

¶33 From the beginning, Andrade was told by Internal Affairs that they were investigating him for violating two identified Department policies because he posted inappropriate, disrespectful, and defamatory comments on Facebook. Investigators showed him and asked him about every concerning post. He knew that violations such as this could lead to discipline up to and including suspension and discharge. And following the investigation, the Department charged Andrade with violating the previously identified policies due to his Facebook posts.[21] He was therefore on notice of the charges (the rule

---

[21] Andrade and the amicus brief by the Milwaukee Police Association contend that even if no notice of the discharge rationale was necessary, the procedures giving Andrade notice of the nature of the investigation and the investigatory interview itself were insufficient. They say Loudermill requires notice of the "charges," which requires something more than an investigation. This reads Loudermill too woodenly, as we have explained. And in any event, the Department formally notified Andrade of the charges on August 23, 2018 prior to his termination on September 12. This notice included the policies violated and the behavior that caused those violations—the

21

violations) and the evidence supporting them (the Facebook posts). It should not have surprised Andrade, then, when the Chief discharged him for one of the violations.[22]

¶34 Even more, Loudermill instructs that the "nature" of the post-termination review informs the "formality," "procedural requisites," and "scope" of the pre-termination process. Id. at 545; id. at 547 n.12. Here, there can be no question Andrade received thorough post-termination review. After discharging Andrade, the Chief filed a formal complaint with the Board that explained the charges and evidence. The Board then held a full-blown trial, giving Andrade the opportunity to call his own witnesses and cross-examine the Department's. Afterward, the Board considered seven comprehensive standards in making its "just cause" determination. The end result was a detailed, ten-page written decision containing findings of fact and conclusions of law, thereby providing a robust substantive, procedural, and evidentiary check on the discipline Andrade received. After that, Andrade appealed to the circuit court, which reviewed the Board's just cause determination. These extensive post-termination procedures eliminate any doubt that Andrade had all the notice and opportunity to be heard that the Constitution requires.

---

Facebook posts.

[22] Even if one might consider the ability to testify as additional evidence that Andrade's conduct failed to sustain the confidence of the community, Loudermill does not require employers to notify employees of every jot and tittle supporting their decision.

¶35 In sum, we hold that Andrade received all the process he was due under the Fourteenth Amendment. He received sufficient pre-termination notice of the charges and evidence against him, and he was afforded an opportunity to respond. This was supported by post-termination review at multiple levels. Andrade received the "initial check against mistaken decisions" that Loudermill commands. Id. at 545. Therefore, his contention that the Board applied an incorrect theory of law when it sustained the charges against him is not supported by the facts or law.

## B. Wis. Stat. § 62.50(13)

¶36 Andrade also briefly argues that Chief Morales failed to comply with Wis. Stat. § 62.50(13). This provision requires the police chief to notify the Board of a discharge or suspension greater than five days, and to include "a complaint setting forth the reasons for the discharge or suspension." § 62.50(13). Andrade contends the complaint did not do so because it failed to mention the inability to testify.

¶37 Andrade's error here is similar to his analytical error regarding due process. He suggests the "reasons for the discharge" language means he must be informed of the reasons the punishment rose to the level of discharge rather than a suspension or some other lesser punishment. But that's not what the statute says. It says "reasons for the discharge or suspension"——in other words, the reason some serious form of discipline was imposed. The statute does not require an

23

explanation of all the reasons a specific level of discipline was chosen.

¶38  Here, the complaint Chief Morales filed with the Board was simple, straightforward, and consistent with the statute. The Chief listed the Department policy Andrade violated for charge one, the punishment of a 30-day suspension, along with the evidence supporting the violation——the Facebook posts.  The complaint also listed the Department policy Andrade violated for charge two, the punishment of discharge, along with the evidence supporting the violation——the Facebook posts.  As we explain above, the inability to testify was not the conduct that violated the policies, but rather a consequence of Andrade's conduct that informed the level of punishment imposed. Therefore, the complaint submitted by Chief Morales to the Board complied with § 62.50(13).

## III.  CONCLUSION

¶39 Andrade challenges the process by which he was terminated.  He argues that the Due Process Clause required Chief Morales to notify him of the reasons underlying the Chief's choice of discipline.  Andrade also contends that the complaint submitted by Chief Morales to the Board did not set forth the reasons for the discharge in compliance with Wis. Stat. § 62.50(13).  Based on the facts of this case, neither challenge succeeds.  Both pre-termination and in the complaint to the Board, Andrade received the process due to him under Wisconsin law and the U.S. Constitution.

24

*By the Court.*—The decision of the court of appeals is affirmed.

¶40 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting).* Because of his behavior on social media, Officer Erik Andrade ("Andrade") may very well have ultimately received the same discipline. I do not condone his behavior. But as an accused, Andrade is owed certain due process rights, rights which are constitutionally and statutorily protected.[1] Andrade was denied these due process rights.

¶41 Fundamental to those basic due process rights, Andrade has the right to receive notice of what he is being charged with. He has a statutory right to receive notice as to the evidence supporting the decision to terminate him. And, after having been placed on notice but before the discipline was imposed, Andrade has the fundamental due process right to present a defense as to why the proposed action should not be taken. Because Andrade was denied these fundamental due process rights, I dissent.

I

¶42 While employed with the Milwaukee Police Department ("the Department"), Andrade posted and shared multiple posts to

---

[1] See U.S. Const. amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

his private Facebook page.[2] A local alderman obtained a screenshot of Andrade's social media posts and shared it with the assistant chief of police. Shortly after being notified, the Department's Internal Affairs office followed up on the screenshot, conducting an extensive investigation into Andrade's social media posts.

¶43 At the conclusion of a lengthy investigation into Andrade's posts, Andrade was charged with violating two provisions of the Department's Code of Conduct——core values[3] and

_____

[2] Officer Andrade's posts stemmed initially from the Department's high-profile arrest of Milwaukee Bucks player Sterling Brown. Brown allegedly double-parked in a disabled parking spot outside of a Walgreens store and responding officers tased and forcibly arrested him. Brown subsequently filed a civil lawsuit against the Department and the officers involved in his arrest, arguing the Department used excessive force and deprived him of his civil rights. Andrade was present at Brown's arrest and assisted with transport and was therefore one of the officers named as a defendant in Brown's complaint. He was the only officer not disciplined for his role. However, Andrade's social media postings came to light in part because Brown's complaint highlighted several of Andrade's postings as an admission that officers had free rein to engage in "unlawful attacks and arrests of African-Americans without justification" and without "fear of real discipline."

Andrade's right to due process is not conditioned on how the court or the public perceives the content of his posts. This dissent does not attempt to excuse or overlook the posts; they are inexcusable. However, courts have a responsibility to safeguard the due process rights of all litigants, regardless of any personal feelings on what litigants stand accused of.

[3] The pertinent core value provisions of the Department's Code of Conduct are as follows:

1.00 - Competence.
We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performance and the standards of our

2

social media use.[4]  Per the Chief's charging order, Andrade

"post[ed] content to a social networking site that was

> conduct. We are exemplary leaders and exemplary followers.
>
> . . .
>
> 3.00 - Integrity.
> We recognize the complexity of police work and exercise discretion in ways that are beyond reproach and worthy of public trust. Honesty and truthfulness are fundamental elements of integrity.  It is our duty to earn public trust through consistent words and actions.  We are honest in word and deed.
> [Guiding Principle] 3.01
> Our behavior shall inspire and sustain the confidence of our community. Whether on or off duty, department members shall not behave in such a way that a reasonable person would expect that discredit could be brought upon the department or that it would create the appearance of impropriety or corruptive behavior.

[4] The pertinent provisions of the Department's Standard Operating Procedures on Social Networking Sites (SNS) are:

[685.15  USE OF SOCIAL NETWORKING SITES]

> A.    PRECAUTIONS AND PROHIBITIONS.
>
> . . .
>
> 5.    As public employees, members do not lose their rights under the First Amendment of the U.S. and Wisconsin Constitutions.  However, speech, on or off duty, pursuant to your official duties and professional responsibilities as members of the Milwaukee Police Department is not protected. Members are free to express themselves as private citizens on SNS to the degree that their speech is not disruptive to the mission of the department.
>
> . . .
>
> 10.   Members must be aware that their communication on SNS can be used by a skilled defense attorney in impeaching testimony in association with their

3

disruptive to the mission of the department" and "fail[ed] to inspire and sustain the confidence of our community." The Chief issued a personnel order outlining Andrade's discipline for violating those two provisions of the Department's Code of Conduct, imposing a 30-day suspension without pay in response to Andrade "[p]osting content to a social media networking site that was disruptive to the mission" of the Department. However, in response to Andrade's "[f]ailure to inspire and sustain the confidence of our community," the Chief terminated Andrade. As required by Wis. Stat. § 62.50(13), the Chief notified the Board of Police and Fire Commissioners ("the Board") of his decision to suspend and terminate Andrade. Andrade then appealed his termination.

¶44 During Andrade's two-day post-termination disciplinary appeal hearings, the Chief repeatedly testified that it was the fact that he could not use Andrade as a witness that resulted in his termination. But for Andrade's inability to be used as a witness, the Chief testified that

> [Andrade] was going to get disciplined. He brought discredit to the department on discipline and as I stated earlier, the purpose of firing him is I can't use him as a witness in court.

¶45 According to the Chief's testimony, the district attorney's inability to use Andrade as a witness in court was the sole reason the Chief terminated Andrade:

> [MPD Counsel]   . . . I think your testimony was he
>                 only got fired because the DA's position

---

> professional duties as a member of the department.

4

took it over the edge. To bring discredit to the department would have only led to severe discipline. Is that fair?

[Chief]        Yes.

[MPD Counsel] Same thing with the second charge. You wouldn't have fired him for failing to inspire and sustain the confidence in our community but for the DA's decision. Is that fair?

[Chief]        That is fair.

[MPD Counsel] I don't want to beat a dead horse, although I know that expression is not supposed to be used anymore. Are you saying that [Andrade] was solely fired because of the DA's decision at the end of the day?

    . . .

[Chief]        Yes.

¶46 The district attorney's assertion that he would not be able to use Andrade as a witness put the "inability to testify" directly at issue. In fact, the Chief testified that "if there was a DA that would use [Andrade]," then he would welcome Andrade to reapply to the Department. The Chief again testified that he would not have dismissed Andrade but for that determination:

[MPD Counsel] Now let's assume that wasn't the case. Let's assume he could still testify. Would this still be discipline-worthy conduct by Mr. Andrade?

[Chief]        Absolutely.

[MPD Counsel] Can you give us a sense of how serious it would be without the testimony piece of it?

5

[Chief]  It would imposed heavy discipline (sic). I probably would have not -- or I would not have dismissed him. I would not have fired him had it not been for his inability to testify in court or be used by the district attorney's office to testify in court.

¶47 The Board ultimately upheld the imposed discipline, concluding that "[Andrade's] posts and comments undermined trust in the department, disrupted the mission of the department, and created the appearance of impropriety and corruption in the department" so the resulting termination "underscore[d] the seriousness of the offense." Andrade appealed his termination to the Milwaukee County circuit court,[5] which, on review, upheld the Board's decision. The court of appeals also upheld Andrade's termination, determining the reason Andrade had been terminated──the inability to testify as a witness──was "a consequence of his failure to inspire and sustain the confidence of the community and the harm he has done to the department's mission." Andrade v. City of Milwaukee Bd. of Fire & Police Comm'rs, No. 2020AP333, unpublished slip op., ¶36 (Wis. Ct. App. Aug. 31, 2021). Finally, Andrade petitioned this court for review.

II

¶48 The United States Constitution recognizes due process as a fundamental right afforded all litigants. This fundamental right to due process "includes the right to . . . procedural due process." State v. Hager, 2018 WI 40, ¶40, 381 Wis. 2d 74, 911 N.W.2d 17. "Procedural due process imposes constraints on

---

[5] The Hon. Jeffrey A. Conen, presiding.

governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." Matthews v. Eldridge, 424 U.S. 319, 332 (1976). "Procedural due process requires that government action 'be implemented in a fair manner.'" Hager, 381 Wis. 2d 74, ¶40; see also State v. Laxton, 2002 WI 82, ¶10 n.8, 254 Wis. 2d 185, 647 N.W.2d 784; United States v. Salerno, 481 U.S. 739, 746 (1987). To succeed on a procedural due process claim, "a plaintiff must show a deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' without due process of law." Penterman v. Wis. Elec. Power Co., 211 Wis. 2d 458, 473, 565 N.W.2d 521 (1997) (citing Zinermon v. Burch, 494 U.S. 113, 125-26 (1990)).

¶49 "The minimum procedural protections required by the Due Process Clause vary depending on the context." Miller v. Zoning Bd. of Appeals of Vill. of Lyndon Station, 2023 WI 46, ¶12, 407 Wis. 2d 678, 991 N.W.2d 380 (citing Eldridge, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.") (quoting another source)). "The essential requirements of due process . . . are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). Due process fundamentally requires "the opportunity to be heard." Goldberg v. Kelly, 397 U.S. 254, 267 (1970) (quoting Grannis v. Ordean, 234 U.S. 385, 394 (1914)). "The opportunity to present reasons, either in person or in writing, why proposed

7

action should not be taken is a fundamental due process requirement." Loudermill, 470 U.S. at 546. "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." Fuentes v. Shevin, 407 U.S. 67, 81 (1972).

¶50 Though the Board upheld the Chief's decision to terminate Andrade over his perceived inability to testify, Andrade was not provided with that information as the basis for discharge until post-termination. Through this failure, Andrade's constitutional right to due process, as guaranteed under Loudermill, was violated. Through this failure, Andrade was likewise denied the statutory procedural rights he was due as required by Wis. Stat. § 62.50(13), which required the Chief to provide Andrade with the reasons for his discharge and to do so at the same time he imposed the correlating discipline. Andrade was provided alternative reasons for discharge throughout the pre-termination process——for violation of two provisions of the Department's Code of Conduct——before he was finally provided the actual reason necessitating his discharge—— his perceived inability to testify——in the post-termination proceedings.

## A. Per Loudermill, Andrade Was Owed More Due Process Than He Received.

¶51 The majority is correct that "due process guarantees in this context are not rigid and formal; they are flexible." Majority op., ¶5. However, the process due cannot be so flexible as to have no solid parameters or shape at all. At its foundation, procedural due process requires that the accused be

8

provided "notice and an opportunity to respond" to the charges presented, as well as "an explanation of the employer's evidence." Loudermill, 470 U.S. at 546.

¶52 Relying on its prior determination in Eldridge,[6] in Loudermill, the United States Supreme Court held that procedural due process entitles a tenured public employee "to [pre-termination process] consisting of oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Loudermill, 470 U.S. at 546. The pre-termination process itself does not necessarily need to be formal, so long as it affords the employee an opportunity to make any "plausible arguments" that might prevent the discipline. Id. at 544. A pre-termination hearing "should be an initial check against mistaken decisions——essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46.

¶53 Loudermill and its predecessor Eldridge combine to place very specific obligations on the government, "impos[ing] constraints on governmental decisions which deprive individuals

---

[6] Matthews v. Eldridge, 424 U.S. 319, 334-35 (1976) (finding that "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest . . .").

9

of . . . 'property' interests." Eldridge, 424 U.S. at 332. The government must provide an employee with notice and an opportunity to be heard regarding the specific charges that are determined after an investigation has been completed, as well as the specific evidence related to the charges. That notice and opportunity to be heard on the specific charges and evidence must be provided pre-termination. As to the Eldridge factors, the property interest affected is high: Andrade faced termination from his job as a police officer. That high interest is juxtaposed against the minimal governmental interest at stake. That governmental interest is minimal given that all the Chief, and ultimately the Board, had to do was provide Andrade with the appropriate notice of the real reason for his termination—his perceived inability to testify, not his "failure to inspire and sustain the confidence of the community."

¶54 Yet, Andrade was not provided these basic requirements of due process pre-termination. The parties do not dispute the fact that Andrade had a legitimate property interest in retaining his job, as the United States Supreme Court has recognized the importance of protecting this property interest:

> [T]he significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood. While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job.

Loudermill, 470 U.S. at 543 (citations omitted).

10

¶55 By not complying with the "imposed constraints" on their decision to deprive Andrade of his property interest, the Chief, and ultimately the Board, ran the risk of erroneous deprivation of Andrade's property interest. And, this is what occurred. Due process guards against the accused having to guess what the accuser is thinking by requiring the accuser to provide the accused with specific notice. But here, Andrade was forced to play a bait-and-switch guessing game due to the lack of specificity provided him which due process requires. The lack of notice thus impacted Andrade's "opportunity to be heard," Goldberg, 397 U.S. at 267, and his corresponding ability to mount a robust defense to the deprivation of his property interest.

¶56 The majority mistakenly relies on the presence of a witness list to show that Andrade was in fact on notice such that Loudermill's requirements were satisfied. Majority op., ¶22 n.12. But this reliance is misplaced: Loudermill requires pre-termination "notice and an opportunity to respond." The witness list in question was filed post-termination, after Andrade had already been deprived of his property interest. While a witness list may provide some helpful context in preparing a legal defense, a witness list, by itself, does not provide enough due process to satisfy the requirements of Loudermill by identifying the perceived inability to testify as the reason for Andrade's termination.

¶57 Notably, the notice required under Loudermill differs from the notice required under a Chapter 164, Wis. Stats., PI-21

notice.[7]    While <u>Loudermill</u> requires employers to provide employees with notice and the chance to respond to "charges" leveled after an investigation but before termination, PI-21 notice requires that the employee be "informed of the nature of the investigation prior to any interrogation."  Wis. Stat. § 164.02(1)(a).    The purpose of the PI-21 notice and investigatory hearing is to focus the officer on the areas of questioning and the "nature of the investigation."  Andrade participated in a PI-21 and was put on notice of two charges for which he was being investigated.  The investigatory notice specifically——and only——referenced Core Value 1.00 (Competence) and Guiding Principle 1.05, as well as Core Value 3.00 (Integrity) and Guiding Principle 3.01 as the basis for which Andrade was being investigated.  Andrade testified that he provided a written response to these specified charges.[8]  He also had the opportunity to respond verbally in the accompanying interview process.

¶58 But Andrade was not "informed of the nature of the investigation" into his conduct.  The PI-21 provided no reason for Andrade to believe that his ability to testify was somehow at issue or being questioned.  That allegation appeared nowhere on the form itself.  Nor was it raised during the ensuing

---

[7] The PI-21 is intended to comply with the requirements of Wis. Stat. § 164.02(1)(a), which states that "the law enforcement officer under investigation shall be informed of the nature of the investigation prior to any interrogation."

[8] As the majority likewise notes, while the parties reference this written response in the record, the response does not appear to be a part of the official record.

interview process, when Andrade had the opportunity to respond. While Andrade read the Department's social media policies aloud during his PI-21, the policies themselves did not inform him that he was being terminated for his perceived inability to testify. In fact, testimony from the interviewing officer confirms that Andrade's perceived inability to testify was not something the Department's Internal Affairs Division considered during its investigation into Andrade's conduct.[9]

¶59 Since Andrade was not placed on notice of the real reason for his termination until post-termination, he was robbed of the "full panoply of due process protections" he was owed pre-termination.[10] That included his ability to respond to the charges leveled and provide evidence to challenge the charges and discipline imposed. While the district attorney alleged that Andrade would have been unable to be used as a witness going forward, Andrade did not have a reasonable opportunity to challenge that assertion prior to being terminated. Had he been provided access to the "full panoply of due process protections" from the beginning, Andrade may have had the opportunity to present evidence in his defense to challenge his termination. He could have defended himself differently, or more robustly,

---

[9] At the post-termination hearings, Andrade's interviewing officer testified that Andrade's perceived inability to testify was "not something that [the Internal Affairs Division] specifically looked at, no. That was something that was brought in as a consideration by the chief's office as to the discipline" after the initial investigation concluded.

[10] Andrade, No. 2020AP333, ¶51 n.1 (Dugan, J., dissenting).

13

had he known with specificity that his property interest was at stake.

¶60 For example, had Andrade actually been provided due process, perhaps Andrade could have presented evidence as to other officers charged with violating the same provisions of the code of conduct that he was,[11] in an attempt to make any "plausible arguments" that might prevent the discipline. Loudermill, 470 U.S. at 544. He could have challenged the blanket assertion that he could not testify, providing proof of other similarly Giglio-impaired officers[12] who nonetheless were

---

[11] According to the testimony of the president of the Milwaukee Police Association ("MPA"), when the Chief and others were determining the level of discipline to impose on Andrade, there were three similarly situated officers who were charged with violations of the same social media policy provision as Andrade, Standard Operating Procedure 685.15(A)(5). One officer "took a one-day suspension apparently after he trashed the department [publicly] on Facebook." Another officer was charged with posting content to a social media networking site "that was destructive to the mission of the department," and received a four-day suspension for his violation; this officer was offered the opportunity to reduce his four-day suspension for violation of the policy down to a two-day suspension if he wrote a letter of apology to the individuals he targeted in his post. Finally, a third officer had two charges, one for violating the same social media policy provision as Andrade, and another for violating Core Value 3.00 Guiding Principle 3.01, also for use of Facebook. He was suspended one day for the first charge of violating the social media policy, and had his second charge (the Facebook post charge for making public comments and threatening to injure a gunshot victim he was responsible for guarding) dismissed by the Chief.

[12] "The United States Supreme Court first imposed a duty on the prosecution to disclose exculpatory evidence to defendants in Brady v. Maryland, 373 U.S. 83 (1963)." State v. Wayerski, 2019 WI 11, ¶71, 385 Wis. 2d 344, 922 N.W.2d 468 (Ziegler, J., concurring in part, dissenting in part).

14

able to testify in order "to present reasons . . . why [the] proposed action should not be taken . . . ." Loudermill, 470 U.S. at 546.[13] He could have provided evidence of the fact that the basis for his termination appeared nonsensical, given that the same district attorney's office was using him to chair a homicide trial up until the date of his discharge.[14] Such challenges would have been appropriate, given that "[p]rocedural due process requires that government action 'be implemented in a

---

> In the wake of Brady, courts responded to the need to refine its application and scope. In Giglio v. United States, 405 U.S. 150, 154-55 (1972), the Supreme Court held that in addition to exculpatory evidence, the prosecution is required to disclose favorable, material evidence that could be used to impeach prosecution witnesses.

Wayerski, 385 Wis. 2d 344, ¶74 (Ziegler, J., concurring in part, dissenting in part).

[13] The MPA president testified:

> There is no testimony or evidence in the record that Officer Andrade can't testify in municipal court and that he can't testify in federal court. Both of those things would be in Milwaukee County and in previous cases where an officer has been determined not to be able to testify in those places, that's been in the Internal Affairs file. . . . Again, no evidence that he can't testify, period, but there is no evidence that he won't be allowed to testify in municipal court or in federal court.

[14] Andrade's counsel represented repeatedly throughout briefing and at oral argument that at the same time the district attorney's office was pushing for Andrade's termination over a perceived inability to testify, the district attorney's office was using Andrade as a witness chairing a homicide trial. This assertion is repeated and alluded to in the post-termination appeal hearing record, though documentation supporting this representation does not appear in the record.

15

fair manner.'" Hager, 381 Wis. 2d 74, ¶40; see also Laxton, 254 Wis. 2d 185, ¶10 n.8.

¶61 The Milwaukee Police Association ("MPA") maintains records and "comparables" on the individuals who are under investigation, as well as the outcomes of those investigations. In the post-termination appeal hearings, the MPA's president relied on those records to testify that from his experience in handling and tracking officer discipline, the level of discipline Andrade received compared to other officers charged with the same social media policy provision violation was "egregious":

> In all cases, when we compare what one officer did to another officer and ultimately, what the discipline that was doled out was, it is a difficult process because they are all different, but if you take a look at, say, this person posted something on Facebook or social networking and, then, you compare what the discipline ended up being, we have already discussed the results, that this is egregious as far as discipline.

In his testimony, the MPA president based his opinion on the fact that other officers charged with the same violation tended to receive suspensions or written reprimands rather than termination:

> [Andrade's Counsel] Do you recall the average length of discipline for individuals that were not discharged? (Emphasis added.)
>
> . . .
>
> [MPA] I think it was, like, 30 days or less, maybe even ten days or less. . . .

16

[Andrade's Counsel] Do you recall three of the disciplines were reprimands and two were dismissed outright?

[MPA] I am looking at them now, yes. Absolutely.

[Andrade's Counsel] The highest discipline was ten days besides the 30-day one?

[MPA] That is correct.

¶62 There were officers who were initially discharged for violation of code of conduct provisions. And those officers, unlike Andrade, committed crimes yet were still not disciplined to the level Andrade was.[15]

¶63 The MPA's president also testified as to the district attorney's assertion that Andrade could not serve as a witness going forward, calling the district attorney's assertion "unprecedented":

[MPA] I think we have established and I think Officer Andrade probably -- I won't speak for him -- wishes that those posts weren't put out there, but certainly, these posts don't rise to the subjective level of the district attorney's office

---

[15] Of the officers who were discharged, one was originally discharged but had the discharge reduced to a 35-day suspension, even though "his situation garnered significant media attention" as Andrade's did. A second officer, who was charged with violating Core Value 3.00 Guiding Principle 3.01 by "[b]ehaving in such a way that a reasonable person would expect that discredit could be brought upon the Department," received only a district-level written reprimand, although her emails also contained material that likewise contained what both counsel and the MPA president described as "overtly racist" content. Another officer was charged with "intentionally or with reckless disregard for the truth mak[ing] an untrue statement" for lying to federal agents and Internal Affairs, yet was promoted to detective and was allowed to continue testifying.

17

to say that they are impeachable toward credibility.

[MPD Counsel] So you disagree with the DA's determination.

[MPA] I absolutely do, yes. It is unprecedented.

[MPD Counsel] So your testimony is that the DA's office has never deemed anyone unable to serve as a witness in criminal cases -- an officer.

[MPA] No. That is interesting. That is perception. The way you look at one post and the way I look at a post are two different things and certainly, when I was specifically talking about an individual who posts something on a social network to, then, be so compromised that he can no longer testify, I have never heard of that.

¶64 The record bears that out as well. Counsel asserted throughout briefing and oral argument before this court that nearly 120 officers were included on the Giglio-impaired list, yet Andrade was the one "being singled out." The other officers were still able to remain on the force and testify, challenging the notion that Andrade was somehow uniquely situated and his termination was the only logical result to his charges.

¶65 Given that the most stringent discipline imposed for similar code of conduct violations were suspensions, it seems highly suspect to demand that Andrade be on notice of something he was never charged with, and be on notice of a discipline that no other officers facing the same violation received. It is a disservice to due process to demand that Andrade defend himself against an accusation provided after the fact, and defend

18

himself against a discipline which by all accounts was above and beyond what others in his situation endured.[16]

¶66 It is not reading <u>Loudermill</u> "too woodenly" as the majority asserts, majority op., ¶33 n.21, to recognize that due process demands Andrade be on notice and provided with the actual reason for his termination prior to depriving him of his property interest in continued employment. Nor is it demanding more than due process requires to expect that Andrade be provided the evidence substantiating the actual reason for his termination, so as to enable him to defend himself and his interests. Andrade's perceived inability to testify was not merely a consequence of Andrade's misconduct, as the majority states. Majority op., ¶¶32, 38. Andrade's perceived inability to testify was the "sole" reason for his termination. The Chief testified as much during Andrade's post-termination hearing in front of the Board. Accordingly, this "sole" reason for

---

[16] This apparent disparity is found by a full review of the testimony in the record. Particularly given the opening paragraph of this dissent, it is disingenuous to insinuate that the dissent is "suggesting the punishment Andrade received was inappropriate and egregious" or that it is second guessing the discipline imposed upheld. Majority op., ¶22 n.13. Rather, the dissent respects the constitutional and statutory process that is due. The dissent shines light on the hole at the foundation of the majority's argument——that Andrade was provided, in any measure, the notice he was due. As I stated at the outset, Andrade may have ultimately received the same discipline due to his conduct. Again, I do not condone his behavior. But Andrade was owed the "essential requirements of due process" prior to the imposed discipline and deprivation of his property interests. The record amply supports that Andrade was denied these "essential" due process protections.

19

termination cannot be both a consequence of the decision to terminate and a part of the decision to terminate.

¶67 Due process is "flexible" per Eldridge but it is not flexible on "[t]he essential requirements" of "notice and an opportunity to respond" and "the opportunity to present reasons, either in person or in writing, why [the] proposed action should not be taken . . . ." Loudermill, 470 U.S. at 546. And, if the due process right "to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented," so it must be provided pre-deprivation of Andrade's property interest. Fuentes, 407 U.S. at 81.

¶68 Andrade was provided notice and the opportunity to respond to the charges of two specific violations of two provisions of the Department's Code of Conduct. Had those specified charges been the reason that Andrade was terminated, due process could have been satisfied. But Andrade was terminated for a third, unspecified and unnoticed reason. Andrade's fundamental due process rights were impermissibly violated.

### B.  Per Wis. Stat. § 62.50(13), Andrade Was Owed More Due Process Than He Received.

¶69 Andrade was also owed a heightened level of due process per Wis. Stat. § 62.50(13), which required the Chief to provide a complaint "setting forth the reason[]" for Andrade's termination.  The statute seems to require even broader due process protections than are due under the "flexible" Eldridge standard Loudermill relies on.  But, given that the Chief failed

20

to comply with the statute's directive to supply the reason for Andrade's termination, Andrade's due process rights were violated.

¶70 "[S]tatutory interpretation begins with the language of the statute." State ex. rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "If the meaning of the statute is plain, we ordinarily stop the inquiry." Id. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id. Finally, "[i]n construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute." Id., ¶46.

¶71 Wisconsin Stat. § 62.50(13) provides the disciplinary process for handling police officer suspensions or terminations.[17] Section 62.50(13) mandates that where discharge

---

[17] Section 62.50(13) provides, in pertinent part, as follows:

> NOTICE OF DISCHARGE OR SUSPENSION; APPEALS. The chief discharging or suspending for a period exceeding 5 days any member of the force shall give written notice of the discharge or suspension to the member and, at the same time the notice is given, shall also give the member any exculpatory evidence in the chief's possession related to the discharge or suspension. The chief shall also immediately report the notice of the discharge or suspension to the secretary of the board of fire and police commissioners together with a complaint setting forth the reasons for the discharge or suspension and the name of the complainant if other than the chief. Within 10 days after the date of service of the notice or a discharge or suspension order the members so discharged or suspended may appeal from the order of discharge or suspension or

21

or suspensions are concerned, the chief must provide the officer facing discipline with notice of the discipline and simultaneously provide a complaint "setting forth the reasons for the discharge or suspension." Id.

¶72 The statute's process requirements align with the "essential requirements of due process" from Loudermill, namely, providing the accused with "notice and an opportunity to respond" to the specific charges filed. Loudermill, 470 U.S. at 546. By requiring the Chief to provide written notice of the "reasons for the discharge" to the offending officer and the Board, this statutory process provides the accused with "[t]he opportunity to present reasons . . . why the proposed action should not be taken." Id. Compliance with the statute ensures that the officer facing discipline is provided both with notice as to the specific charges levied, and the opportunity to respond and defend against those noticed charges. The Board's limited role then is to work within the parameters of those specified charges in determining whether the accused violated the rules or orders noticed in the charges filed. See Wis.

discipline to the board of fire and police commissioners, by filing with the board a notice of appeal in the following or similar form . . . .

(Emphasis added.)

22

Stat. § 62.50(17)(b)5. This procedural due process structure is reiterated throughout the applicable statutory section.[18]

¶73 But the Chief put Andrade on notice of two "charges" pre-termination that he recognized post-termination as differing from the actual reason for Andrade's termination. Pre-termination, Andrade was charged with "failure to inspire the confidence of the community" and terminated on the basis of that noticed charge. But post-termination, the Chief identified that Andrade's perceived inability to testify was actually the sole "charge" necessitating his termination. The statute requires the Chief to have provided Andrade with notice on that "reason for the discharge" in the complaint he filed with the Board. But the Chief neglected to do so. That failure to comply with the statutory requirements interfered with Andrade's "essential" due process rights to be on notice of the actual charge for which he faced termination.

---

[18] See, e.g., Wis. Stat. § 62.50(16) ("The accused shall have full opportunity to be heard in defense and shall be entitled to secure the attendance of all witnesses necessary for the defense . . . ."); § 62.50(17)(a) ("Within 3 days after hearing the matter the board . . . shall . . . determine whether by a preponderance of the evidence the charges are sustained. If the board or panel determines that the charges are sustained, the board shall at once determine whether the good of the service requires that the accused be permanently discharged or be suspended without pay for a period not exceeding 60 days or reduced in rank. If the charges are not sustained the accused shall be immediately reinstated in his or her former position, without prejudice."); § 62.50(17)(b) ("No police officer may be . . . discharged by the board . . . based on charges filed by . . . the chief . . . unless the board determines whether there is just cause, as described in this paragraph, to sustain the charges.").

¶74 The majority incorrectly reads the statute to "require[] nothing more" than that the complaint list the policies which Andrade violated and reference the social media postings forming the basis of the violations. Majority op., ¶7. But what the statute actually requires is clear: that the chief immediately report the notice of the discharge or suspension to the secretary of the Board, "together with a complaint setting forth the reasons for the discharge or suspension." Wis. Stat. § 62.50(13) (emphasis added). While the Chief and the Board determined that Andrade violated two provisions of the Department's Code of Conduct, the record posits that the Chief would have disciplined Andrade for those infractions, but instead terminated him because of the district attorney's office determination that they would not be able to use Andrade as a witness going forward. The Chief testified repeatedly to this effect in the post-termination appeal hearings. This actual reason for Andrade's termination appears nowhere in the complaint, though it is statutorily required.

¶75 The Chief failed to comply with the "reasons" requirement of Wis. Stat. § 62.50(13) when he put Andrade on notice of termination for reasons other than the actual reason for Andrade's termination. The Chief also failed to comply with the statute's "timing" requirement. Andrade received notice of the actual reason for his termination during the post-termination appeal hearings. These hearings took place some two months after the Chief issued his personnel order and complaint outlining his imposed discipline, namely, Andrade's termination

24

for "failure to inspire confidence in our community." But the statute demands the terminated officer be provided something more: the reasons for termination at the time of imposed discipline.

¶76 Since the Chief failed to include the inability to testify——what he admitted was the "sole" reason that Andrade was discharged——in the complaint accompanying the notice of discharge, the Chief failed to comply with the plain directive of Wis. Stat. § 62.50(13). Andrade's due process rights were violated.

### III

¶77 Andrade did not receive due process when he was terminated from the Department for his perceived inability to testify. Andrade was deprived of his property interest without having ever been placed on notice of the actual charge, nor provided the opportunity to respond. This deficient process fails to satisfy either the "flexible" Eldridge standard relied on in Loudermill or the more demanding standard required by Wis. Stat. § 62.50(13). It is not necessary to consider the content of the offensive Facebook postings. They are distasteful and unbecoming of police officers.[19] But due process, even when flexible, demands certain "essential requirements" be met,

_____

[19] Though the contexts between this case and Miller v. Carroll differ, the warning I provided should be heeded by all public officials. The risks of public officers using social media vastly outweigh the benefits. See Miller v. Carroll, 2020 WI 56, ¶67, 392 Wis. 2d 49, 944 N.W.2d 542 (Ziegler, J., concurring) (cautioning the Wisconsin bench about the hazards of using social media such as Facebook in order to avoid due process violations of parties' rights).

25

namely, that the accused be provided "notice and an opportunity to respond." Loudermill, 470 U.S. at 546. These "essential requirements" of due process were not provided here. Due process under the statute required the Chief to provide Andrade with a complaint "setting forth the reasons" for Andrade's termination at the time that discipline was imposed. The Chief testified that the sole reason for Andrade's termination was his perceived inability to testify. Yet, that reason for termination was not provided to Andrade until post-termination.

¶78 Ultimately, due to his behavior, Officer Andrade may still have received the same discipline. In pointing out that Andrade was not provided the process he was due, this dissent does not condone his behavior. Rather, this dissent respects the constitutional and statutory process Andrade was due, and acknowledges that due process requires Andrade receive notice of the facts that support the discipline and what he is being disciplined for. He was not provided that.

¶79 For the foregoing reasons, I respectfully dissent.

¶80 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.